Daniel L. Chen (CA SBN 312576)
Eric C. Rassbach (CA SBN 288041)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine University, Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
310-506-4611 tel / 310-506-7663 fax
daniel.l.chen@pepperdine.edu

Eric S. Baxter (DC BN 479221)*
Michael J. O'Brien (DC BN 90025077)*
Amanda L. Salz (DC BN 1671976)*
Phillip J. Allevato (CA BN 362581)†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel / 202-955-0090 fax

* *Pro hac vice* application pending
† Not a member of the D.C. Bar; admitted in California.
Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVAN JUSTIN TAYLOR; and ROSE ELIZABETH TAYLOR,<br><br>    Plaintiffs,<br><br>v.<br><br>SUNNYVALE SCHOOL DISTRICT; GUDIEL R. CROSTHWAITE, in his personal and official capacities as Superintendent of Schools for the Sunnyvale School District; PEGGY SHEN BREWSTER, in her personal and official capacities as member of the Sunnyvale School District Board of Education; ISABEL JUBES-FLAMERICH, in her personal and official capacities as member of the Sunnyvale School District Board of Education; EVELYN CASTILLO PROFETA, in her personal and official capacities as member of the Sunnyvale School District Board of Education; | **CASE No.: 26-6211**<br><br>**JUDGE:**<br>_____<br><br>**VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, DECLARATORY RELIEF, AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

MICHELLE MAGINOT, in her personal and official capacities as member of the Sunnyvale School District Board of Education; BRIDGET WATSON, in her personal and official capacities as member of the Sunnyvale School District Board of Education; PAUL SLAYTON, in his official capacity as Director of Student Support Services for the Sunnyvale School District; and SHANA RIEHL, in her official capacity as Interim Principal of Cumberland Elementary School,

Defendants.

COMPLAINT

**PRELIMINARY STATEMENT**

1. The Sunnyvale School District (the "District"), its Superintendent and Board members, and the named District employees (collectively, "Sunnyvale") denies parents the right to receive notice and opt their elementary-age children out of LGBTQ+ instruction that conflicts with their faith. This lawsuit is about whether Sunnyvale's denial violates parents' constitutional rights to direct the education and upbringing of their children in accordance with their sincerely held religious beliefs.

2. Last term in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), the Supreme Court provided an unequivocal answer: Yes. Specifically, the Court held that a Maryland public school board's "introduction of … 'LGBTQ+-inclusive' storybooks [and instruction]—combined with its decision to withhold notice to parents, and to forbid opt outs—substantially interfere[d] with the religious development of [the objecting parents'] children and impose[d]" an "unacceptable" "burden on religious exercise." *Id.* at 550. Accordingly, parents with religious objections to such instruction were "entitl[ed] to a preliminary injunction" that "ordered [the school board] to notify them in advance whenever one of the [LGBTQ+-inclusive] books in question or any other similar book is to be used in any way and to allow them to have their children excused from that instruction." *Id.* at 569.

3. The Supreme Court's answer was well publicized, both across California school districts and to Sunnyvale specifically. Weeks after the decision, the California Department of Education ("CDE") issued guidance acknowledging that the "fundamental holding in *Mahmoud* is that where a school (or its board) adopts policies or curricular materials that the school has reason to know will 'substantially interfere with the religious development' of parents' children and/or will pose a 'very real threat of undermining the religious beliefs and practices' that parents wish to instill in their children, the school must provide notice to parents of the policy or material and an opportunity for the parents to opt their children out of the policy or

COMPLAINT

2

exposure to the material." Cal. Dep't of Educ., *Supreme Court Decision in* Mahmoud v. Taylor at 1 (Aug. 6, 2025), https://perma.cc/E89X-8SJ2.

4. In particular, the CDE recognized that "a notice and opt out option" was "require[d]" for "the specific facts presented in *Mahmoud*—an elementary classroom curriculum that incorporated LGBTQ+ themed storybooks"—such that "the *Mahmoud* case will necessarily impact how [Local Education Agencies] approach the implementation of policies and curricular materials that may substantially interfere with children's religious development or 'undermin[e] the religious beliefs and practices the parent wishes [to] instill in the child,'" including that "LEAs may be required to notify parents of the plan and provide parents with an opportunity to opt out" under "these circumstances." *Id.* at 1-2.

5. Other California public school districts got the message and—while continuing to provide LGBTQ+ instruction—implemented notice and opt-out policies. Riverside Unified School District, for instance, created an online form entitled "*Mahmoud* Parent/Guardian Request for Student Opt-Out of Specific Instructional Content," which provides parents "the option to request that their child be excused from specific instructional content when it may conflict with a parent or family's religious upbringing of their child pursuant to that parent or family's sincerely held religious beliefs." Riverside Unified Sch. Dist. Bd. of Educ., Mahmoud *Parent/Guardian Request for Student Opt-Out of Specific Instructional Content*, https://perma.cc/C3ZW-E5A8. Forms are submitted electronically to "mahmoudoptout@riversideunified.org" and Riverside schools commit to "[f]inding [a]lternative[]" educational activities. Riverside Unified Sch. Dist., *Mahmoud Opt-Out Policy*, https://perma.cc/MQ85-C5A2.

6. At first, Sunnyvale seemed to get the message too. The Sunnyvale Board of Education hosted a governance meeting on August 21, 2025, to discuss *Mahmoud* and "Instructional Program and Assessments" as "[k]ey topics." Sunnyvale Sch. Dist., Facebook (Aug. 19, 2025), https://perma.cc/6GEH-RNVL. In that meeting,

COMPLAINT

3

Superintendent Crosthwaite provided the Board with the CDE's guidance on how to implement opt-outs post-*Mahmoud*. Sunnyvale Sch. Dist., *Regular Board Meeting-Governance*, Cal. Sch. Bds. Ass'n (Aug. 21, 2025), https://perma.cc/8SLN-FGDU.

7. Not long after, on September 18, 2025, the Board adopted Resolution # R26-08: "Reaffirming Sunnyvale's Commitment to Safe, Inclusive Schools for All Students and Staff." Sunnyvale Sch. Dist., *Resolution # R26-08: Reaffirming Sunnyvale's Commitment to Safe, Inclusive Schools for All Students and Staff* (Sep. 18, 2025), https://perma.cc/T3TK-BQCX. Among the recitals, the "Board recognize[d] that … legal opt-out provisions may exist"—albeit while committing "not to focus narrowly on opt-out requirements" and declaring that "our first responsibility is to remind families of the richness of what 'opting in' provides." *Id.* at 1.

8. But Sunnyvale abruptly flipped its position, making this case necessary. Sunnyvale has now affirmatively disclaimed its constitutional responsibility to afford families what the First Amendment requires: notice and the ability to opt their children out of instruction that "substantially interferes with the religious development of their children." *Mahmoud*, 606 U.S. at 550.

9. Sunnyvale requires "LGBTQ+-inclusive" instruction of the same type addressed in *Mahmoud*. **Exhibit A** at 1. According to Sunnyvale, "California state law and [Sunnyvale's own] Board-adopted policy regarding instructional materials and curriculum" demand that it does so. *Id.* "Under California law," Sunnyvale has declared, "districts are required to provide inclusive instructional content that reflects the diversity of our community, including representation of LGBTQ+ individuals and families, as part of our core academic program." *Id.* The Board resolved, following *Mahmoud*, that it "will continue to … [e]nsure that inclusive curriculum—including LGBTQIA representation"—"remains integral to the District's equity and inclusion efforts." *Resolution # R26-08*, https://perma.cc/T3TK-BQCX. Sunnyvale's website offers a plethora of LGBTQ+ books and teaching resources to that end—including some of the very books at issue in *Mahmoud*.

COMPLAINT

4

10. Sunnyvale has also embraced LGBTQ+ teaching guidance from the Santa Clara County Office of Education ("SCCOE"), which oversees Sunnyvale. That guidance tells teachers to integrate "diverse gender identities and expressions" in history lessons, to "disrupt traditional definitions of the family" through lessons on "[g]ender identity" and what it means to be "Two Spirit," and to use various "LGBTQ" picture books for "Pre K – Elementary" literacy. Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* at 8-9, 17, https://perma.cc/EVJ5-Y8Y6.

11. "But [many] Americans wish to present a different moral message to their children. And their ability to present that message is undermined when the exact opposite message is positively reinforced in the public school classroom at a very young age." *Mahmoud*, 606 U.S. at 552.

12. Plaintiffs Justin and Rose Taylor, who have a rising third-grade son and rising first-grade daughter at Cumberland Elementary School ("Cumberland") in the Sunnyvale School District, are two such parents. As devout members of The Church of Jesus Christ of Latter-day Saints, they, like "[m]any Americans," including the parents in *Mahmoud*, "believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly." 606 U.S. at 552.

13. The Taylors also believe that Sunnyvale's curriculum is age-inappropriate and inconsistent with their religious beliefs, practices, and child-raising philosophies, and that forcing their children to participate in Sunnyvale's LGBTQ+ instruction will undermine their efforts to raise their children in accordance with their religious beliefs.

14. So, in September 2025, the Taylors asked Sunnyvale to notify them and opt their children out of all "lessons, instructions, and events" when "'LGBTQ+-inclusive' storybooks or similar materials … will be used in any way." **Exhibit B** at 1. In their emailed request, the Taylors specifically called attention to the Supreme Court's opinion in *Mahmoud*.

COMPLAINT

5

15. In response, in early October, Sunnyvale provided the Taylors with a form presenting various categories of parental "opt out options," including any "[i]nstructional [m]aterials" that "substantially interfere with [a] child's religious development" or "conflict with [parents'] religious beliefs or moral convictions." **Exhibit C**. The form indicated that the District would "review" such requests and "excuse [the parents'] child from that instruction in accordance with applicable law." *Id.* at 2. The Taylors confirmed their original opt-out request.

16. By November, Sunnyvale had also directed school librarians not to "check out material that includes LGBTQ+ or Gender Identity material" to the Taylor children. Ex. B at 2-3.

17. All the while, the Taylors patiently awaited an official response, crediting a Sunnyvale official's explanation that the delay in confirming their requested opt-out was simply because "[o]ur typical 'opt out' process is not functional for Mahmoud v. Taylor yet." *Id.*

18. Yet after months of cordial conversation, Sunnyvale abruptly reversed course and denied the Taylors' request for notice and opt-outs, stating in a letter that LGBTQ+ instruction "is not optional and is not subject to parent opt-out provisions." Ex. A at 1. According to Sunnyvale, "the U.S. Supreme Court's decision in Mahmoud v. Taylor … addressed a specific set of facts in another state," did not create a "general or automatic right for parents to opt their children out of required curriculum," and "does not override California's statutory requirements governing instructional content." *Id.* With that, the denial letter concluded that Sunnyvale is "not granting opt-outs from LGBTQ+-inclusive curriculum or storybooks that are part of our adopted educational program." *Id.*

19. After Sunnyvale denied Plaintiffs their requested notice and opt-out, Plaintiffs' counsel also sent Sunnyvale a letter on April 1, 2026, detailing *Mahmoud*'s holding and explaining why denying the Taylors an opt-out violates the First Amendment. Sunnyvale acknowledged receipt but still never granted an opt-out.

COMPLAINT

6

20. Instead, despite this clear, longstanding knowledge of *Mahmoud*, which gives parents the right to receive notice and opt their children out of LGBTQ+ instruction, Sunnyvale doubled down.

21. Sunnyvale's denial of parental notice and opt-outs for religiously burdensome instruction violates the Free Exercise Clause's guarantee that parents have the right to guide the religious development of their children.

22. In the face of Sunnyvale's unconstitutional denial of notice and opt-outs, and willful disregard for Supreme Court precedent, the Taylors bring this lawsuit to vindicate those long-recognized and now clearly established rights.

## DIVISIONAL ASSIGNMENT

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims alleged in this pleading occurred in the Northern District of California. Pursuant to Local Rule 3-2(e), all civil actions that arise in the counties of Santa Clara, Santa Cruz, San Benito, or Monterey shall be assigned to the San Jose Division.

## PARTIES

### *The Plaintiffs*

24. Plaintiffs Justin and Rose Taylor are domiciled in California. They reside in the Sunnyvale School District in Santa Clara County.

25. They currently have two children enrolled at Cumberland in the Sunnyvale School District: a rising third-grade son and a rising first-grade daughter.

### *The Defendants*

26. Defendant Sunnyvale School District is a government entity that exists to provide K-8 education to students in Sunnyvale, California.

27. The District's principal place of business is 819 W. Iowa Avenue, Sunnyvale, CA 94086.

COMPLAINT

7

28. The District comprises eight elementary schools and two middle schools in a thirteen-mile area in the northwest section of Santa Clara County—the heart of Silicon Valley.

29. As of spring 2026, the District employs more than 800 educators, administrators, and support staff, and serves nearly 6000 students. Educ. Data P'ship, *District Summary – Sunnyvale – Student*, https://perma.cc/Q49V-BQ5G.

30. The District has an operating budget of over $150 million. Educ. Data P'ship, *District Summary – Sunnyvale – Financial Data*, https://perma.cc/HTM7-BB73.

31. The District is diverse: as of the 2025-2026 school year, over 25% of its students were Asian, over 40% were Hispanic/Latino, and nearly 10% were multiracial. Cal. Dep't of Educ., *2025-26 Enrollment by Ethnicity* (2025), https://perma.cc/8A5B-XWF5.

32. Over a quarter of the District's students speak English as a second language. Cal. Dep't of Educ., *English Learner Students by Language by Grade* (2025-26), https://perma.cc/K8X3-QML8 (1,451 students out of 5,682).

33. Approximately 45 languages are represented among the District's students. Sunnyvale Sch. Dist., *Media Kit: Fast Facts*, https://perma.cc/LV4P-73QH.

34. Unlike many other school districts in Silicon Valley, the District is of mixed socioeconomic class. 27% of students are on free or reduced lunch. *Id.*

35. Defendant Gudiel R. Crosthwaite, Ph.D., is the Superintendent of the District.

36. In that role, Dr. Crosthwaite is charged with implementing the policies at issue.

37. At all relevant times, Dr. Crosthwaite was acting under color of state law.

38. He is sued in his official and personal capacities.

39. Defendants Peggy Shen Brewster, Isabel Jubes-Flamerich, Evelyn Castillo Profeta, Michelle Maginot, and Bridget Watson are elected members of the Sunnyvale Board of Education.

COMPLAINT

8

40. In their roles, they are responsible for establishing the policies at issue, approving curriculum and textbooks, and governing the District in accordance with the California Education Code and other federal and state laws.

41. At all relevant times, they were acting under color of state law.

42. They are sued in their official and personal capacities.

43. Defendant Paul Slayton is Director of Student Support Services for the District.

44. In that role, Mr. Slayton coordinates and supports board policies related to student service requests.

45. At all relevant times, he was acting under color of state law.

46. He is sued in his official capacity.

47. Cumberland is an elementary school in the District.

48. Cumberland's students are also highly diverse: as of the 2025-2026 school year, almost 40% of its students were Asian, over 17% were Hispanic/Latino, and nearly 10% were multiracial. Cal. Dep't of Educ., *2025-26 Enrollment by Ethnicity* (2025), https://perma.cc/8A5B-XWF5.

49. Defendant Shana Riehl is the Interim Principal of Cumberland as of Spring 2026 and held that position during the relevant time period.

50. In that role, Ms. Riehl is charged with implementing the District policies at issue.

51. At all relevant times, she was acting under color of state law.

52. She is sued in her official capacity.

53. Each Defendant is a "person" under 42 U.S.C. § 1983 for purposes of injunctive relief, and is sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

### JURISDICTION AND VENUE

54. This court has jurisdiction over this matter because Plaintiffs assert causes of action, including civil rights causes of action, arising under federal statutes and the U.S. Constitution. 28 U.S.C. §§ 1331, 1343.

COMPLAINT

55. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims alleged in this pleading occurred within the jurisdiction of this Court. 28 U.S.C. § 1391. Additionally, on information and belief, all Defendants are domiciled or located in the Northern District of California.

## FACTUAL BACKGROUND

### *The Taylors*

56. Justin and Rose Taylor are religiously devout members of The Church of Jesus Christ of Latter-day Saints.

57. They have four children, two of whom currently attend Cumberland.

58. Guided by Church teaching, the Taylors believe that "[a]ll human beings—male and female—are created in the image of God," are "a beloved spirit son or daughter of heavenly parents," and possess "a divine nature and destiny." The First Presidency and Council of the Twelve Apostles of The Church of Jesus Christ of Latter-day Saints, *The Family: A Proclamation to the World*, The Church of Jesus Christ of Latter-day Saints (Sep. 23, 1995), https://perma.cc/VT3C-NX3K.

59. Accordingly, the Taylors believe that every individual has inherent divine worth and equal dignity before God and should be treated with love, kindness, and respect, regardless of religion, race, sex, sexual orientation, gender identity, nationality, or other such identifying characteristics.

60. Also as taught by the Church, the Taylors believe that marriage is ordained of God and that the family is central to God's plan for their eternal destiny. Correspondingly, they believe that sexuality should be expressed only in marriage between a man and a woman and that a person's "gender" or "biological sex" is "an essential characteristic of individual premortal, mortal, and eternal identity and purpose." *The Family: A Proclamation to the World*, https://perma.cc/VT3C-NX3K; *see also* The Church of Jesus Christ of Latter-day Saints, *Church Policies and Guidelines* § 38.6.23, in *General Handbook: Serving in The Church of Jesus Christ of Latter-day*

COMPLAINT

10

*Saints* (Mar. 2026), https://perma.cc/K7J9-2QF5 (explaining that "[t]he intended meaning of *gender*" in the Family Proclamation "is biological sex at birth").

61.  They believe that husbands and wives have a solemn responsibility to love and care for their children, and a sacred duty to rear their children in love and righteousness, provide for their physical and spiritual needs, and observe the commandments of God.

62.  They believe that fathers and mothers will be held accountable before God for the discharge of these obligations. In particular, they believe there are detrimental spiritual consequences from letting authority figures such as schoolteachers teach their children principles concerning sexuality and gender that contradict Church teachings.

63.  They believe that they have a sacred religious duty to teach their children about sexuality and gender in a way that is consistent with their religious beliefs.

64.  They believe that such matters should be taught to children in age-appropriate ways and when parents think best.

65.  They believe that Sunnyvale's LGBTQ+ instruction goes far beyond teaching kindness and respect (as a matter of manners or virtuous citizenship).

66.  Rather, they believe such instruction pushes on young, impressionable children an ideological view of gender and sexuality that undermines the religious and moral values they are obligated to instill in their children.

67.  They believe that it is spiritually, mentally, and physically injurious to introduce children prematurely to the perspective and values affirmed by "LGBTQ+-inclusive" instruction, including messages that condone or celebrate same-sex relationships or that suggest one's gender is distinct from his or her biological sex.

68.  Instruction—including lesson plans, books, discussions, and curricula—designed to disrupt or interfere with these religious beliefs about gender and sexuality violates the Taylors' sincerely held religious beliefs and violates their fundamental right to guide the religious upbringing of their children.

COMPLAINT

11

*Sunnyvale's LGBTQ+ Instruction*

69.  Sunnyvale School District has a comprehensive LGBTQ+ curriculum, which integrates LGBTQ+ history, representation, and examples throughout instructional units to show "diverse backgrounds, identities, experiences, and abilities, including those who are lesbian, gay, genderqueer, bisexual, transgender, queer/questioning, intersex, asexual (LGBTQIA)." *Resolution # R26-08* at 1, https://perma.cc/T3TK-BQCX. This instruction applies "across [all] grade levels." Sunnyvale Sch. Dist., *SSD Board of Education passes resolution reaffirming the District's commitment to safe, inclusive schools*, https://perma.cc/B33Q-YZF5.

70.  The Santa Clara County Office of Education oversees Sunnyvale and has issued a "Teaching Guide" for "LGBTQ+" instruction for purposes of implementing Sunnyvale's commitment "to celebrate and recognize the contributions, struggles, and achievements of lesbian, gay, bisexual, transgender, and queer individuals throughout history." Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* at 2, https://perma.cc/EVJ5-Y8Y6. According to the guidance, LGBTQ+ instruction should suffuse lessons across subject matter areas:

- "Health and Science Lessons" should adopt a "strategy" of "explicitly teach[ing] about gender identity and sexual orientation in a comprehensive and inclusive way," including "guidance on how to teach about gender identity and sexual orientation." *Id.* at 21. Among other things, that means replacing references to "women" with "ovaries" in discussions about reproductive capacity to acknowledge "gender diversity" and "[helping] students recognize recurring injustices such as … sex verification in sports." *Id.*

- "Literacy Lessons" should include various "LGBTQ" books for "Pre K – Elementary" ages. *Id.* at 17 (collecting recommended book lists).

- "History Lessons" should promote "acceptance of diverse gender identities and expressions." *Id.* at 8. For example, the Guide provides a sample fourth-grade lesson on "Two Spirit and Non-Traditional Families," with the goal of

COMPLAINT

12

"disrupt[ing] traditional definitions of the family" through lessons on "Gender identity" and what it means to be "Two Spirit." *Id.* at 9-10.

- Even for math, the guidance directs that "[i]ncorporating LGBTQ+ inclusion in mathematics curriculum is crucial," so teachers should "use problems that relate to marriage equality, gender-neutral bathrooms, and LGBTQ+ rights to demonstrate mathematical concepts such as statistics, probability, and geometry." *Id.* at 12.

71. The guidance lays bare its motivations in quoting "LGBTQ+ rights activist" Barbara Gittings: "The struggle is really won in the hearts and minds of the community, where it really counts." *Id.* at 8. Here, this means converting the impressionable hearts and minds of four- to ten-year-olds.

72. Sunnyvale has embraced this guidance. *See, e.g.*, Sunnyvale Sch. Dist., *LGBTQIA+ Resources*, https://perma.cc/65HW-W68F (linking to SCCOE LGBTQ+ teaching guidance as "Staff Resources").

73. Cumberland, the Sunnyvale elementary school where the Taylor children attend, openly lists the books it uses to carry out such instruction, as does the District itself.

74. "A few short descriptions will serve to illustrate the general tenor of the storybooks" recommended for use in Cumberland's and the District's mandatory LGBTQ+ instruction. *Mahmoud*, 606 U.S. at 533.

75. For example, one book, *Pride Puppy*,[1] invites three- and four-year-olds to look for images of things they might find at a pride parade, including an "intersex [flag]," a "[drag] king" and "[drag] queen," "leather," "underwear," and an image of a

---

[1] *See* Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* at 17, https://perma.cc/EVJ5-Y8Y6 (collecting sources with recommended LGBTQ+ books for "Pre K-Elementary," including *Pride Puppy*); San José Public Library, *LGBTQ Materials for Pre K to Elementary*, https://perma.cc/4HSA-LN3R (linked by *LGBTQ+ Teaching Guide* and listing *Pride Puppy*).

COMPLAINT

13

celebrated LGBTQ activist and sex worker, "Marsha P. Johnson." The book also depicts a minister wearing a rainbow stole and students and teachers enthusiastically advocating for "Peers + Queers," "Pride Club," "Love Knows No Gender," and "Two Spirit Pride." **Exhibit D** at 10, 14.





*Fig. 1*

76.    Another picture book, *Prince & Knight*,[2] tells the story of a coming-of-age prince whose parents wish to match him with "a kind and worthy bride" but who falls

---

[2]    *See* Sunnyvale Sch. Dist., *LGBTQIA Resources*, https://perma.cc/RA8E-HSHG (recommending LGBTQ+ "Picture Books," including *Prince & Knight*); Sunnyvale Pub. Libr., *LGBTQ+ Picture Books*, https://perma.cc/WQL4-8NRJ (linked by Sunnyvale and listing *Prince & Knight*).

COMPLAINT

14

into the embrace of a knight. The prince and knight gaze into each other's eyes and their hearts begin to race. The two men then get married and the whole kingdom applauds. **Exhibit E** at 6-36.



*Fig. 2*

77.   A third book, *The Hips on the Drag Queen Go Swish, Swish, Swish*,[3] by Lil Miss Hot Mess,[4] changes the lyrics of the classic children's song *The Wheels on the Bus* to lyrics celebrating drag. The book is replete with drag queens sporting facial hair, high-heeled boots, and "bling," and shows them "swish[ing]" their hips, "shimmy[ing]" their shoulders, and "twirl[ing]." Describing the book, its author has publicly stated that "There's no 'Drag 101,' but [the book] gets [kids] swishing and shimmying and twirling, so they can embody and celebrate some of the things queens do. If they like it, maybe they'll want to be drag queens when they grow up, too." Joshua Rotter, *A Drag Queen Story Hour star and activist publishes her own kids' book*, 48hills (May 5, 2020), https://perma.cc/C63V-VL97.

---

[3]   *See* Sunnyvale Sch. Dist., *LGBTQIA Resources*, https://perma.cc/RA8E-HSHG (recommending LGBTQ+ "Picture Books"); Sunnyvale Pub. Libr., *LGBTQ+ Picture Books*, https://perma.cc/WQL4-8NRJ (linked by Sunnyvale and listing *The Hips on the Drag Queen*).

[4]   Lil Miss Hot Mess is the stage name of Harris Kornstein's drag queen persona. Harris Kornstein, *Harris Kornstein: scholar + artist of queer play*, https://perma.cc/CVH2-2JC8.

COMPLAINT

16



*Fig. 3*

78.    A fourth book, *Jack (not Jackie),*[5] by Erica Silverman, follows the story of a young girl, Susan, who struggles with but ultimately accepts her younger sibling Jackie's gender transition. Inuka Wellington, *Jack Not Jackie by Erica Silverman*

---

[5]    *See Sunnyvale Sch. Dist., LGBTQIA Resources,* https://perma.cc/RA8E-HSHG (recommending LGBTQ+ "Picture Books"); Sunnyvale Pub. Libr., *LGBTQ+ Picture Books,* https://perma.cc/WQL4-8NRJ (linked by Sunnyvale and listing *Jack (not Jackie)*).

COMPLAINT

**READ ALOUD**, YouTube (Nov. 2, 2022), https://www.youtube.com/watch?v=2yDN-jFrL64. When Susan tries to play with Jackie through traditionally feminine toys and activities, like play-acting as "forest fairies," Jackie refuses, preferring to play-act as an explorer and make mud pies. *Id.* at 1:37. When Susan takes Jackie shopping for girls' clothes, Jackie instead runs to the boys' section, picking out shorts, a shirt, a baseball cap, and a tie. *Id.* at 2:35. After Susan objects, saying "No ties! … ties are for boys," her mother tells her that "[we] wear what feels right," and that for Jackie, wearing a tie is "not wrong … just different." *Id.* at 2:49. When Jackie finally declares that "I am a boy," and wants to go by Jack, Susan again objects, shouting that "I WANT MY SISTER BACK!" *Id.* at 4:03. Ultimately, Susan is made to realize that Jackie is still the same person, and that "My sister. My brother. It's okay, either way," causing her "heart … to feel bubbly again." *Id.* at 5:01.

79.   In an author's note, Silverman explains that, beginning "as early as two years old … transgender children like Jack … feel a profound disconnect between their gender identity—who they know themselves to be and the sex (M or F) that the doctor wrote down on their birth certificate." *Id.* at 5:37. The note further states that "if a child's self-expression is met with disapproval or anger, it causes serious damage that can take years to overcome." *Id.* Finally, the author notes the "power of books to open our hearts and minds," and expresses hope that the work has "done the same for you." *Id.* at 5:41 The book closes with a list of books, articles, and online resources about parenting transgender and "gender-creative" children. *Id.* at 5:43.

COMPLAINT

18

*Fig. 4*

80.  A fifth book, *Stella Brings the Family*,[6] by Miriam B. Schiffer, follows the story of Stella, a girl with two fathers, who is told to invite a special guest for her class Mother's Day party. First Grade Party, *Stella Brings the Family- Read Aloud*, YouTube (Oct. 23, 2020), https://www.youtube.com/watch?v=uKZXuPBhX_Y. Because "Stella would be the only one without a mother at the Mother's Day party," she "worr[ies] about the party when she should have been worrying about other things." *Id.* at 0:44. She explains to her friends that her fathers and extended family members do all the things that mothers do, like "reading [her] bedtime stories" and "kiss[ing her] when [she is] hurt," but is still unsure about inviting them all to the party. *Id.* at 1:35. On the day of the party, Stella "[has] the biggest crowd of them all," with her fathers and extended family all attending. *Id.* at 2:46. The party ends up

---

6    *See* Sunnyvale Sch. Distr*., LGBTQIA Resources*, https://perma.cc/RA8E-HSHG (recommending LGBTQ+ "Picture Books"); Sunnyvale Pub. Libr., *LGBTQ+ Picture Books*, https://perma.cc/WQL4-8NRJ (linked by Sunnyvale and listing *Stella Brings the Family*).

COMPLAINT

being "better than Stella had imagined," and concludes with Stella assuring her exhausted teacher that for Father's Day, she won't bring nearly as many people, "just two." *Id.*



*Fig. 5*

81.    Finally, a sixth book, *Born Ready: The True Story of a Boy Named Penelope*,[7] by Jodie Patterson, adapts the true story of a child, Penelope, who claims that "I don't *feel* like a boy. I AM a boy." **Exhibit F** at 12. The mother agrees to tell their family "what we know," that Penelope "[is] a boy." *Id.* at 3:34. Penelope's grandfather agrees that "gender isn't such a big deal." *Id.* at 4:19. When Penelope's brother protests that Penelope "can't *become* a boy. You have to be born one," he is told that "[n]ot everything *needs* to make sense. *This is about love.*" *Id.* at 4:40. Papa agrees that Penelope is a boy as long as Penelope will "tell me yourself." *Id.* at 5:00. And when

---

[7]    *See LGBTQ+ Teaching Guide* at 17, https://perma.cc/EVJ5-Y8Y6 (linking "Recommended Books by the California Department of Education," including *Born Ready*); Cal. Dep't of Educ., *CDE Recommended List 2022-2025, Cumulative*, TeachingBooks, https://perma.cc/EV49-H65S (linked by *LGBTQ+ Teaching Guide* and listing *Born Ready*).

COMPLAINT

Penelope tells the principal "I think like a boy. I feel like a boy. … I'm sure I'm a boy," the teacher notes that "today [Penelope is] *my* teacher." *Id.* at 6:19.



*Fig. 6*

82.    Sunnyvale has "voiced its expectation that teachers use the LGBTQ-Inclusive Books as part of instruction." *Mahmoud*, 606 U.S. at 535 (internal quotation marks omitted). *See Resolution # R26-08* at 2, https://perma.cc/T3TK-BQCX (committing to "[p]rovide strong guidance, resources, and training for teachers to confidently

COMPLAINT

21

implement inclusive materials and resist pressures that would erase or diminish LGBTQIA content"); Ex. A at 1 (LGBTQ+ instruction "required").

***Sunnyvale's Opt-Out Policy***

83. Although Sunnyvale has denied Plaintiffs opt-outs from the LGBTQ+ instruction, it allows opt-outs from other areas of instruction.

84. Under California law, Sunnyvale must provide notice and opt-outs for human sexuality instruction because "parents and guardians have the ultimate responsibility for imparting values regarding human sexuality to their children." Cal. Educ. Code § 51937; *see also id.* §§ 51938-51939 (requiring rights and procedures for notice, opt-outs, and alternative activities). Thus, as in *Mahmoud*, Sunnyvale "continues to permit children to opt out of other school activities, including the 'family life and human sexuality' unit of instruction, for which opt outs are required under [state] law." *Mahmoud*, 606 U.S. at 540.

85. And, also like the school board in *Mahmoud*, Sunnyvale "goes to great lengths to provide independent, parallel programming for many other students, such as those who qualify as emergent multilingual learners (EMLs) or who qualify for an individualized educational program." 606 U.S. at 566.[8]

86. Yet Sunnyvale continues to stand by pre-*Mahmoud* policies and guidance documents requiring LGBTQ+ instruction and prohibiting opt-outs. And post-*Mahmoud*, Sunnyvale has doubled down.

---

[8] *See* Cal. Dep't of Educ., *2025-26 Special Education Enrollment by Program Setting: Cumberland Elementary Report*, DataQuest, https://perma.cc/6GJG-8DAD (showing that 82 Cumberland Elementary students were enrolled in special education); Cal. Dep't of Educ., *2025-26 K-12 Enrollment by Age Range: Cumberland Elementary Report*, DataQuest, https://perma.cc/66LD-EKQ3 (showing that 14.7% of Cumberland Elementary students were enrolled in IEPs); *see also* Cal. Dep't of Educ., *English Learner Students by Language by Grade: Cumberland Elementary* (2025-26), https://perma.cc/S6WS-TMFW (showing that 15.7% of Cumberland Elementary students were enrolled in EML programs).

COMPLAINT

22

***The Taylors' Notice and Opt-out Request***

87. Having learned of Sunnyvale's LGBTQ+ curriculum and the *Mahmoud* decision, the Taylors "began contacting individual teachers, principals, [and District] staff about the [instruction] and asking that their children be excused from classroom instruction related to [it]." *Mahmoud*, 606 U.S. at 537.

88. The Taylors first reached out to Cumberland's Interim Principal Shana Riehl and their children's teachers via email on September 25, 2025. Ex. B at 1.

89. Tracking the Supreme Court's opinion in *Mahmoud*, that email requested that the school:

(1) provide the Taylors with "[a]dvance written notice whenever any 'LGBTQ+-inclusive' storybooks or similar materials, will be used in any way";

(2) allow their children to be "excused from those lessons, instructions, and events in which such books or similar materials are used," and be provided with "a neutral alternative activity without academic penalty, stigma, or unexcused absences"; and

(3) provide basic "[i]nformation about how the District permits parents to review curriculum materials." *Id.* at 1.

90. Removing any doubt about the school's constitutional obligations, the email specifically called attention to the Supreme Court's decision in *Mahmoud*. *Id.*

91. Cumberland appeared understanding at first, and Ms. Riehl made an initial notation to school librarians not to check out books that carried LGBTQ+ messages to the Taylor children. *Id.* at 2-3.

92. On October 8, 2025, Paul Slayton, the District's Director of Student Support Services, sent the Taylors Sunnyvale's Parent Opt-out Form. Ex. C.

93. The form identified various "opt out options" available to parents. *Id.* In addition to opt-outs for sexual health education (comprehensive or partial), behavioral health surveys, and physical examinations, the form provided opt-outs for any "[o]ther [i]nstructional [m]aterials" that "substantially interfere with [a] child's

COMPLAINT

23

religious development" or "conflict with [parents'] religious beliefs or moral convictions." *Id.* The form indicated that the District would "review" such requests and "excuse [the parents'] child from that instruction in accordance with applicable law." *Id.* at 2.

94. The Taylors confirmed their original notice and opt-out request and continued open and cordial dialogue with Ms. Riehl and Paul Slayton, for months. Ex. F at 2-7.

95. But after the New Year, the Taylors heard nothing back from Sunnyvale until they again reached out to Mr. Slayton regarding their request. *Id.* at 7.

### Sunnyvale's Knowing Denial of Notice and Opt-Outs

96. Once the Taylors reached back out to Mr. Slayton, he assured them that he would convey their full request to Superintendent Crosthwaite. *Id.*

97. Mr. Slayton also informed the Taylors that Sunnyvale's "typical 'opt out' process is not functional for Mahmoud v. Taylor yet" and that "legal council [sic] is still a bit confused as to how to formally respond to these requests," so he would "defer" the Taylors' request until he could consult District leadership. *Id.* at 8.

98. Both the Board and Superintendent were well aware of *Mahmoud*'s holding and what it required.

99. In an August 21, 2025 Board meeting, Superintendent Crosthwaite discussed *Mahmoud* with the Board and supplied it with guidance from the California Department of Education. Cal. Sch. Bds. Ass'n, *Regular Board Meeting-Governance* (Aug. 21, 2025); *see also* Sunnyvale Sch. Dist., Facebook (Aug. 19, 2025), https://perma.cc/6GEH-RNVL.

100. That guidance explained that the "fundamental holding in *Mahmoud* is that where a school (or its board) adopts policies or curricular materials that the school has reason to know will 'substantially interfere with the religious development' of parents' children and/or will pose a 'very real threat of undermining the religious beliefs and practices' that parents wish to instill in their children, the school must

COMPLAINT

24

provide notice to parents of the policy or material and an opportunity for the parents to opt their children out of the policy or exposure to the material." *Supreme Court Decision in* Mahmoud v. Taylor at 1, https://perma.cc/E89X-8SJ2.

101. The guidance also recognized that a "notice and opt out option" was "require[d]" for "the specific facts in *Mahmoud*—an elementary classroom curriculum that incorporated LGBTQ+ themed storybooks"—such that "the *Mahmoud* case will necessarily impact how [Local Education Agencies] approach the implementation of policies and curricular materials that may substantially interfere with children's religious development or 'undermin[e] the religious beliefs and practices the parent wishes to instill in the child,'" including that "LEAs may be required to notify parents of the plan and provide parents with an opportunity to opt out" under "these circumstances." *Id.* at 1-2.

102. On February 3, 2026, Sunnyvale abruptly and inexplicably changed course. Thanking the Taylors "for [their] patience" as Sunnyvale "conducted a final administrative review of [their] request to opt out of [LGBTQ+] instructional materials," Mr. Slayton informed the Taylors that, "[f]ollowing a comprehensive review at the District leadership level," Sunnyvale was denying their opt-out request, because it "[did] not align" with Sunnyvale's "core instructional framework" and its "commitment to a unified curriculum." **Exhibit G** at 1.

103. Through Mr. Slayton, District leadership acknowledged that this was a "shift from [their] previous working sessions," which had "focused on designing an individual implementation plan" for the Taylors to "opt out of [LGBTQ+] instructional materials." *Id.* at 1. Through Mr. Slayton, District leadership also "acknowledge[d] the impact" this would "have on [the Taylor] family," but insisted upon denying "accommodations" to "maintain[] the integrity of the board-approved curriculum." *Id.* Mr. Slayton attached a formal denial letter, signed by Mr. Slayton and bearing the names of Superintendent Crosthwaite and the Board Defendants. *Id.*

COMPLAINT

25

104. The denial letter declared that the "LGBTQ+-inclusive curriculum [and] storybooks" were part of Sunnyvale's "adopted educational program" pursuant to "California state law and Board-adopted policy regarding instructional materials and curriculum." Ex. A at 1. It states that "[t]his content is not optional and is not subject to parent opt-out provisions." *Id.* at 1.

105. The denial letter acknowledged *Mahmoud* and brushed it aside, asserting that it "addressed a specific set of facts in another state" and "does not override California's statutory requirements governing instructional content." *Id.* "Accordingly, and after further review," the denial letter explained, "Sunnyvale School District is not granting opt-outs from LGBTQ+-inclusive curriculum or storybooks that are part of our adopted educational program." *Id.*

106. Resurrecting a position rejected in *Mahmoud*, the denial letter closed with cold comfort: "While [Sunnyvale] cannot remove students from required instruction, we encourage families to engage in ongoing conversations with their children … if questions arise about classroom learning." *Id.* at 1-2. *Contra Mahmoud*, 606 U.S. at 563 (rejecting the argument that "parents who send their children to public school must endure" religiously prohibitive instruction and instead "must try to counteract that teaching at home"—a dodge that makes "no difference to the First Amendment analysis").

107. Sunnyvale's denial is flatly inconsistent with *Mahmoud* itself. It is also inconsistent with the CDE's guidance on *Mahmoud*'s "fundamental holding" as requiring "a notice and an opt out option" for "an elementary classroom curriculum that incorporate[s] LGBTQ+ themed storybooks." *Supreme Court Decision in* Mahmoud v. Taylor at 1, https://perma.cc/E89X-8SJ2.

108. Instead, Sunnyvale's opt-out denial is consistent with the District's post-*Mahmoud* resolution to "confidently implement inclusive materials and resist pressures that would erase or diminish LGBTQIA content"—for to do otherwise

COMPLAINT

26

would be to make a "compromise[] for the comfort of adults or institutional caution." *Resolution # R26-08* at 2, https://perma.cc/T3TK-BQCX.

109. Sunnyvale's denial is also consistent with pre-*Mahmoud* County-level guidance stating that "[i]t is essential … that LGBTQ+ topics are not part of parental opt out options" and "[s]chools may not facilitate the selective opt-out of lessons that are focused on LGBTQ+ content by parents/guardians." Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* at 6, https://perma.cc/EVJ5-Y8Y6; Santa Clara Cnty. Off. of Educ., *LGBTQ+ District and School Policy Guide* at 20 (Nov. 24, 2024), https://perma.cc/QFS7-CAH2.

110. But Sunnyvale knows, and knew at all relevant times, that this is not legally permissible.

111. Upon the Taylors' receipt of the formal denial letter, counsel sent Sunnyvale a detailed letter explaining *Mahmoud*'s requirements.

112. The letter explicitly noted that California requirements could not preempt the federal Constitution and cited *Mirabelli v. Bonta*, 607 U.S. 492 (2026), as evidence.

113. The letter also noted that individual Board members, the Superintendent, and Defendants Slayton and Riehl would be personally liable for these constitutional violations in light of clear Supreme Court precedents.

114. Sunnyvale acknowledged receipt of the letter but provided no response. To this day, it continues to deny the Taylors their requested notice and opt-outs.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**U.S. Const., amend. I, Free Exercise Clause**
**Parental Right to Direct Children's Education and Religious Development**

115. Plaintiffs incorporate by reference all preceding paragraphs.

116. The Free Exercise Clause guarantees an "enduring American tradition": "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v.*

COMPLAINT

27

*Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972)).

117. Under this American tradition, it is generally "for the parent, not the [school], to direct the branches of education [a child] shall pursue, so far as they are taught." *Trs. of Schs. v. People ex rel. Van Allen*, 87 Ill. 303, 309 (1877); *see also Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities."); *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 391 (5th Cir. 2015) (en banc) (referencing "Justice Alito's controlling concurrence" in *Morse*). Accordingly, unless public safety or the "special characteristics" of the school setting are at issue, a school's desired "educational mission" is insufficient to restrict First Amendment rights. *Morse*, 551 U.S. at 423 (Alito, J., concurring).

118. As the Supreme Court recently confirmed, government policy contravenes that tradition, and violates the Free Exercise Clause, when it substantially interferes with parents' rights to direct their children's education and religious development on matters of core religious exercise and parenting. *Mahmoud*, 606 U.S. 522; *Mirabelli*, 607 U.S. at 496.

119. When a policy substantially interferes with parental rights, courts skip the neutrality-and-general-applicability analysis from *Employment Division v. Smith*, 494 U.S. 872, 878-79 (1990), and proceed straight to strict scrutiny. *Mahmoud*, 606 U.S. at 564.

120. Here, Defendants' forced inculcation of LGBTQ+ instruction without notice or opt-outs disrupts and displaces Plaintiffs' religious values and teachings on gender, romance, sex, and sexuality, and thereby substantially interferes with Plaintiffs' parental rights. *Mahmoud*, 606 U.S. at 569.

COMPLAINT

121. Defendants' LGBTQ+ instruction is "unmistakably normative" because it is "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 550.

122. Withholding parental notice and opt-outs from this instruction substantially interferes with the religious development of Plaintiffs' children. *Id.* at 550.

123. As such, withholding parental notice and opt-outs imposes a substantial burden on religious exercise. *Yoder*, 406 U.S. at 218.

124. Burdens on parental rights like those in *Yoder* and *Mahmoud*, and thus here, do not pass strict scrutiny. *Mahmoud*, 606 U.S. at 565-67.

125. Defendants acted contrary to clearly established law when they instituted a policy barring all parental opt-outs for LGBTQ+ instruction and specifically denied Plaintiffs' opt-out requests.

126. Because of this case's factual similarity to *Mahmoud*, *Mahmoud* and *Yoder* provide more than enough legal authority to clearly establish that Defendants' denial of notice and opt-outs violates parental rights.

127. But if that was not enough, the Supreme Court has also already applied *Mahmoud* and *Yoder* to hold that California's school policies denying parents notice and the ability to opt out of policies and instruction concerning sex and gender identity in schools likely violate parental rights under the Free Exercise Clause. *Mirabelli*, 607 U.S. at 496.

128. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

129. Plaintiffs also may in the future suffer monetary damages in suffering emotional and physical distress that has diverted time, attention, and focus from their responsibilities and in being forced to pursue other educational opportunities for their children because of Defendants' disregard for their constitutional rights.

COMPLAINT

29

130. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**U.S. Const., amend. I, Free Exercise Clause**
**General Applicability**

131. Plaintiffs incorporate by reference all preceding paragraphs.

132. A government policy will fail the Free Exercise Clause's general applicability requirement if it prohibits any religious conduct while permitting similar conduct that "undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (cleaned up).

133. The mere existence of a mechanism for individualized exemptions means the policy at issue is not generally applicable, "regardless whether any exceptions have been given." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021).

134. If a policy is not generally applicable for either of these reasons, that "is sufficient to trigger strict scrutiny." *Kennedy*, 597 U.S. at 526 (citation omitted).

135. Here, both general applicability triggers are met by Defendants' refusal to accommodate Plaintiffs' notice and opt-out requests.

136. This failure burdens Plaintiffs' freedom to form their children on a matter of core religious exercise and parenting: how to understand who they are.

137. The first trigger for failing general applicability—a mechanism for individualized assessments—is established several times over.

138. Sunnyvale has already exercised discretion in facilitating the Taylors' request that their children not be permitted to check out LGBTQ+ books from the library.

139. Sunnyvale also, at least as of October 2025, claimed discretion to grant individual parental opt-out requests for *any* "[o]ther [i]nstructional [m]aterials" that

COMPLAINT

30

"substantially interfere with [a] child's religious development" *or* "conflict with [parents'] religious beliefs or moral convictions"—subject to the District's "review" of the individual opt-out request. Ex. C at 2.

140. Further, as the months-long process "focused on designing an individual implementation plan" for the Taylors' requested opt-outs demonstrates, Sunnyvale retains discretion to "explore potential accommodations" and grant individualized exceptions from its LGBTQ+ instruction. Ex. G at 1; *see Fulton*, 593 U.S. at 537.

141. The second trigger—not accommodating some opt-out requests while permitting conduct that similarly undermines the supposed government interest—is also demonstrated in multiple ways.

142. Sunnyvale permits parents to excuse their children from "all or part of comprehensive sexual health education [and] HIV prevention education." Cal. Educ. Code § 51938(a).

143. It also permits substantial numbers of children to be opted out of mainstream classes to attend classes designed for students who qualify as emergent multilingual learners (EMLs) or for an individualized educational program.

144. Its Opt-Out Form also includes categorical opt-outs for "Physical Examination[s]" and behavioral-health "Surveys, tests, research, and evaluation." Ex. C.

145. On information and belief, Sunnyvale permits opt-outs from instruction for a variety of other reasons, including student participation in athletic or other extra-curricular activities.

146. Strict scrutiny therefore applies.

147. Defendants cannot meet their burden to prove that forced participation in the LGBTQ+ curriculum pursues a compelling governmental interest or that it is narrowly tailored to achieve such an interest.

COMPLAINT

148. Defendants cannot "rely on broadly formulated interests" but must explain "the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 593 U.S. at 541 (cleaned up).

149. In other words, Defendants cannot explain why it must force *these* Plaintiffs to violate *their* religious freedom to form their children in their own religious traditions. *See, e.g., id.* ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

150. Defendants cannot show that forcing all children to participate in the LGBTQ+ curriculum is the only way to teach inclusion and civility toward all individuals.

151. Defendants acted contrary to clearly established law when they denied Plaintiffs' opt-out requests.

152. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

153. Plaintiffs also have or may in the future suffer monetary damages in suffering emotional and physical distress that has diverted time, attention, and focus from their responsibilities and in being forced to pursue other educational opportunities for their children because of Defendants' disregard for their constitutional rights.

154. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

155. To the extent this Court finds Defendants' policy generally applicable, then *Smith*, 494 U.S. 872, was wrongly decided.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983**
**U.S. Const., amend. I, Free Exercise Clause**
**Neutrality**

156. Plaintiffs incorporate by reference all preceding paragraphs.

COMPLAINT

32

157. The Free Exercise Clause requires that government policies be "neutral" toward religious exercise.

158. "A government policy will not qualify as neutral if it is specifically directed at religious practice"—detectable if the policy "discriminates on its face, or if a religious exercise is otherwise its object." *Kennedy*, 597 U.S. at 526 (cleaned up).

159. "A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [the Supreme Court] ha[s] 'set aside' such policies without further inquiry." *Id.* at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018)).

160. But even "[f]acial neutrality is not determinative." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

161. The Free Exercise Clause also "forbids subtle departures from neutrality," "protect[ing] against governmental hostility which is masked, as well as overt." *Id.*

162. Thus, if public schools are "to respect the Constitution's guarantee of free exercise," they "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop*, 584 U.S. at 638.

163. Non-neutrality may be demonstrated by the totality of the circumstances surrounding a policy's application, including "the effect of [the] law in its real operation," which "is strong evidence of its object." *Lukumi*, 508 U.S. at 535.

164. A policy reflects non-neutrality in this way when it "as a whole stands most obviously in opposition to more traditional understandings of sexuality and gender," which "are often held by persons with religious viewpoints." *Bates v. Pakseresht*, 146 F.4th 772, 794 (9th Cir. 2025).

165. Just so, Defendants' policy to mandate participation in LGBTQ+ curriculum to discourage a biological understanding of human sexuality is not neutral toward

COMPLAINT

33

religion, in part because it "disproportionately [burdens] persons who observe certain religious faiths," *id.*, and assumes that traditional religious views regarding family life, gender, and sexuality are hurtful, hateful, or bigoted. *See also New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020) (explaining that when the effect of a state policy "fell almost exclusively on adoption services holding particular religious beliefs, that is some reason to suspect that the object of the law was to target those beliefs and to exclude those who maintain them from the adoption process").

166. This burdens Plaintiffs' freedom to form their children on a matter of core religious exercise and parenting: how to understand who they are. *See Bates*, 146 F.4th at 794 (policy non-neutral where it "will overwhelmingly block those … parents who hold traditional religious views on sexuality and gender").

167. Defendants' policy of forced participation in LGBTQ+ instruction is not neutral toward religious exercise.

168. Defendants acted contrary to clearly established law when they denied Plaintiffs' opt-out requests.

169. As with general applicability, Defendants' lack of neutrality toward religious concerns "is sufficient to trigger strict scrutiny." *Kennedy*, 597 U.S. at 526.

170. For the foregoing reasons, Defendants cannot meet their burden to establish that required LGBTQ+ instruction achieves a compelling government interest, and that forcing Plaintiffs to violate their religious beliefs is narrowly tailored to achieve that interest.

171. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being denied by Defendants.

172. Plaintiffs also have or may in the future suffer monetary damages in suffering emotional and physical distress that has diverted time, attention, and focus from their responsibilities and in being forced to pursue other educational opportunities for their children because of Defendants' disregard for their constitutional rights.

COMPLAINT

34

173. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

174. To the extent this Court finds Defendants' policy neutral, then *Smith*, 494 U.S. 872, was wrongly decided.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**U.S. Const., amend. I, Free Speech Clause**
**Viewpoint Discrimination**

175. Plaintiffs incorporate by reference all preceding paragraphs.

176. Defendants' policy to discourage a biological understanding of human sexuality through LGBTQ+ instruction is religious viewpoint discrimination and thereby violates the First Amendment's Free Speech Clause.

177. No matter the "forum" in which speech occurs, viewpoint discrimination is always prohibited. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

178. Accordingly, schools—like other fora for private speech—cannot exclude speech "on the basis of the religious nature of the speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 105 (2001); *Rosenberger*, 515 U.S. at 831 ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.").

179. Here, however, Sunnyvale's LGBTQ+ instruction is "broadly reflective of a particular viewpoint on sexual orientation and gender identity" and excludes religious perspectives on the topic of gender identity. *Bates*, 146 F.4th at 786.

180. Defendants acted contrary to clearly established law when they denied Plaintiffs' opt-out requests.

181. As a "finding of viewpoint bias end[s] the matter," there is no subsequent analysis of strict scrutiny. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) ("Once we have

COMPLAINT

found that a law aims at the suppression of views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute?" (cleaned up)).

182. Plaintiffs have and will continue to suffer the irreparable injury of their First Amendment rights being violated because of Defendants' viewpoint discrimination.

183. Plaintiffs also have or may in the future suffer monetary damages in suffering emotional and physical distress that has diverted time, attention, and focus from their responsibilities and in being forced to pursue other educational opportunities for their children because of Defendants' disregard for their constitutional rights.

184. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**U.S. Const., amend. XIV, Due Process Clause**
**Parental Right to Direct Children's Education and Development**

185. Plaintiffs incorporate by reference all preceding paragraphs.

186. There are few rights older or more fundamental than the right of parents to raise their children in accordance with their beliefs. The earliest Supreme Court cases upholding this fundamental right predate incorporation of the Free Exercise Clause. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) (upholding the right of parents to "establish a home and bring up children" and to "control [their] education"); *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925) (upholding the "liberty of parents and guardians to direct the upbringing and education of children under their control"); *cf. Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause against the states).

187. "[T]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare

COMPLAINT

him for additional obligations." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Pierce*, 268 U.S. at 535).

188. That right—that high duty—is not only deeply embedded in "[t]he history and culture of Western civilization," *Yoder*, 406 U.S. at 232; it also has "a constitutional dimension," *Troxel*, 530 U.S. at 65.

189. A century of Supreme Court decisions establishes that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66.

190. "Under long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497 (quoting *Pierce*, 268 U.S. at 534-35); *see also id.* at 804 (Barrett, J., concurring) (noting that "the doctrine of substantive due process has long embraced" this parental right).

191. Simply put, the "'liberty' specially protected by the Due Process Clause includes the right[] … to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

192. And together, *Mahmoud* and *Mirabelli* clearly guarantee notice and opt-outs for any school practices that interfere with parents' right to direct the development of their children under both the Free Exercise Clause and the Due Process Clause.

193. Sunnyvale's policies regarding LGBTQ+ instruction violate the Taylors' fundamental right to make key decisions regarding the upbringing, education, custody, care, and control of their children, including the right to opt their children out of instruction on family life and human sexuality that violates their deeply held beliefs and practices.

194. At bottom, Sunnyvale's actions violate the "cardinal" principle "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply

COMPLAINT

37

nor hinder." *Troxel*, 530 U.S. at 65-66 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

195. Defendants have disavowed what "[p]ublic schools must not forget": "that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

196. There is no compelling state interest in forcing elementary school children to participate in the LGBTQ+ instruction that outweighs the Taylors' constitutional right to direct the education, upbringing, care, custody, and control of their children.

197. Plaintiffs have and will continue to suffer the irreparable injury of their Fourteenth Amendment rights being denied by Defendants.

198. Plaintiffs also have or may in the future suffer monetary damages in suffering emotional and physical distress that has diverted time, attention, and focus from their responsibilities and in being forced to pursue other educational opportunities for their children because of Defendants' disregard for their constitutional rights.

199. To remedy their injuries, Plaintiffs are entitled to declaratory, injunctive, and monetary relief, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

## DEMAND FOR JURY TRIAL

Plaintiffs demand that the Court set this matter for trial before a jury of their peers.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.     Enter a declaration that the refusal to afford Plaintiffs a right to opt out from LGBTQ+ instruction, including the forced reading of the District's recommended LGBTQ+ storybooks, violates the Free Exercise Clause of the First Amendment;

b.     Enter a declaration that forcing Plaintiffs to educate their children, read, and/or speak consistently with the perspectives contained in the LGBTQ+ instruction

COMPLAINT

38

and compelling Plaintiffs' children to accept one viewpoint to the exclusion of all others violates their rights under the Free Speech Clause of the First Amendment;

c.     Enter a declaration that forcing students, over their parents' objection, to read or listen to the LGBTQ+ instruction violates the Taylors' rights under the Due Process Clause of the Fourteenth Amendment;

d.     Enter preliminary and permanent injunctions prohibiting Defendants from forcing Plaintiffs' children—over the objection of their parents—to read, listen to, discuss, or otherwise participate in the LGBTQ+ instruction, and also requiring Defendants to provide advance notice and an opportunity for opt-outs to any other instruction related to family life or human sexuality.

e.     Award Plaintiffs nominal, compensatory, actual, and punitive damages for loss of their rights under federal law;

f.     Award attorneys' fees and costs under 42 U.S.C. § 1988; and

g.     Award such other relief as the Court may deem just and proper.

COMPLAINT

Respectfully submitted,

Dated: June 22, 2026

By:  /s/ *Daniel L. Chen*
Daniel L. Chen (CA SBN 312576)
Eric C. Rassbach (CA SBN 288041)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine University, Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
310-506-4611 tel / 310-506-7663 fax
daniel.l.chen@pepperdine.edu

Eric S. Baxter (DC BN 479221)*
Michael J. O'Brien (DC BN 90025077)*
Amanda L. Salz (DC BN 1671976)*
Phillip J. Allevato (CA BN 362581)†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel / 202-955-0090 fax

* *Pro hac vice* application pending
† Not a member of the D.C. Bar; admitted in California. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

COMPLAINT

40

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Evan Justin Taylor, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.

Dated:　__6/22/2026__

_____

Evan Justin Taylor

COMPLAINT

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Rose Taylor, declare under penalty of perjury that the foregoing allegations that pertain to me are true and correct to the best of my knowledge.


Dated:  6/22/2026

Rose Elizabeth Taylor

COMPLAINT

42