Eric S. Baxter (DC BN 479221)*
Michael J. O'Brien (DC BN 90025077)*
Amanda L. Salz (DC BN 1671976)*
Phillip J. Allevato (CA BN 362581)†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel / 202-955-0090 fax
mobrien@becketfund.org

Daniel L. Chen (CA SBN 312576)
Eric C. Rassbach (CA SBN 288041)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine University, Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
310-506-4611 tel / 310-506-7663 fax
daniel.l.chen@pepperdine.edu

* Admitted *pro hac vice*
† Not a member of the D.C. Bar; admitted in California.
Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVAN JUSTIN TAYLOR and ROSE ELIZABETH TAYLOR,<br><br>Plaintiffs,<br><br>v.<br><br>SUNNYVALE SCHOOL DISTRICT; GUIDEL R. CROSTHWAITE, in his personal and official capacity as Superintendent of Schools for the Sunnyvale School District; PEGGY SHEN BREWSTER, in her personal and official capacities as member of the Sunnyvale School District Board of Education; ISABEL JUBES-FLAMERICH, in her personal and official capacities as member of the Sunnyvale School District Board of Education; EVELYN CASTILLO PROFETA, in her personal and official | **CASE No.: 5:26-cv-06211**<br><br>**JUDGE: Noël Wise**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: September 30, 2026<br>Hearing Time: 9:00 a.m.<br>Courtroom: 3<br>Judge: Noël Wise |

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211

capacities as member of the Sunnyvale School District Board of Education; MICHELLE MAGINOT, in her personal and official capacities as member of the Sunnyvale School District Board of Education; and BRIDGET WATSON, in her personal and official capacities as member of the Sunnyvale School District Board of Education; PAUL SLAYTON, in his official capacity as Director of Student Support Services for the Sunnyvale School District; and SHANA RIEHL, in her official capacity as Interim Principal of Cumberland Elementary School,

Defendants.

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

## TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on September 30, 2026, at 9:00 a.m., or as soon as it may be heard, Plaintiffs Justin and Rose Taylor, by and through their undersigned counsel, move for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2. This motion will be made before the Honorable Judge Noël Wise, San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, CA 95113.

The Taylors seek to enjoin Defendants from denying them notice of and opt-outs from LGBTQ+ instruction in their children's public school. This Motion and its accompanying Memorandum show that the Taylors are likely to succeed on the merits of their claims under the Free Exercise Clause and the Due Process Clause because Sunnyvale's denial of their request for notice and opt-outs burdens their religious exercise and parental rights and fails strict scrutiny. Because Defendants' policy imposes irreparable harm, and because the equities and public interest favor preventing constitutional violations, the Taylors are entitled to a preliminary injunction.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

STATEMENT OF FACTS ..........................................................................................3

    A. Sunnyvale's LGBTQ+ Instruction ................................................................3

    B. The Taylors' Religious Beliefs ......................................................................7

    C. Sunnyvale's Provision and Denial of Opt-Outs .............................................9

LEGAL STANDARD ..............................................................................................11

ARGUMENT .........................................................................................................11

    I. The Taylors are likely to succeed on the merits of their claims...........................11

        A. Prohibiting parental opt-outs triggers strict scrutiny
        under the Free Exercise Clause. ..........................................................11

            1. Sunnyvale's no-opt-out policy violates the Free Exercise Clause
            under *Mahmoud* by interfering with the Taylors' right
            to direct their children's religious upbringing and
            education................................................................................12

            2. Sunnyvale's no-opt-out policy violates the Free Exercise
            Clause under *Fulton* by allowing individualized
            exemptions..............................................................................15

            3. Sunnyvale's no-opt-out policy violates the Free Exercise
            Clause under *Tandon* because it includes categorical
            exclusions...............................................................................17

            4. Sunnyvale's no-opt-out policy violates the Free Exercise
            Clause under *Lukumi* and *Masterpiece* because it targets
            religious exercise. ....................................................................18

        B. Prohibiting parental opt-outs also triggers strict scrutiny
        under the Due Process Clause. ............................................................19

    II. The no-opt-out policy cannot survive strict scrutiny. .........................................20

        A. Sunnyvale lacks a compelling government interest in denying
        notice and opt-outs for LGBTQ+ instruction..................................................20

B.  The no-opt-out policy is not the least restrictive means for
achieving the asserted government interest. ...................................................23

III. The Taylors satisfy the remaining preliminary injunction factors.......................24

CONCLUSION .........................................................................................................25

CERTIFICATE OF SERVICE ................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alan L. v. Lexington Pub. Schs.,*
  814 F. Supp. 3d 61 (D. Mass. 2025)......................................................................14

*Bates v. Pakseresht,*
  146 F.4th 772 (9th Cir. 2025) ....................................................................11, 18, 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ............................................................................... 18-19

*City of Huntington Beach v. Newsom,*
  No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026).............................20, 21

*Doe v. Dynamic Physical Therapy, LLC,*
  607 U.S. 11 (2025) ....................................................................................21

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
  *Bd. of Educ.,*
  82 F.4th 664 (9th Cir. 2023) ...............................................................*passim*

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ...............................................................................15, 22

*Holt v. Hobbs,*
  574 U.S. 352 (2015) ....................................................................................24

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ....................................................................................18

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025) .............................................................................*passim*

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
  584 U.S. 617 (2018) ....................................................................................18

*Mayweathers v. Newland,*
  314 F.3d 1062 (9th Cir. 2002) .......................................................................20

*Mirabelli v. Bonta,*
  607 U.S. 492 (2026) ...............................................................................20, 21

*Nken v. Holder,*
  556 U.S. 418 (2009) ....................................................................................24

*Pierce v. Soc'y of Sisters,*
   268 U.S. 510 (1925) .................................................................................20

*Ramirez v. Collier,*
   595 U.S. 411 (2022) ............................................................................22, 23

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ...................................................................................24

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ..............................................................................17, 18

*Troxel v. Granville,*
   530 U.S. 57 (2000) ...................................................................................23

*Waln v. Dysart Sch. Dist.,*
   54 F.4th 1152 (9th Cir. 2022) .......................................................15, 16, 18

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .....................................................................................11

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ............................................................................12, 22

*Wolford v. Lopez,*
   No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026) ............................21

**Statutes**

Cal. Educ. Code § 51937.................................................................................9

Cal. Educ. Code § 51938.....................................................................9, 17, 23

Cal. Educ. Code § 51939.................................................................................9

**Other Authorities**

Dr. Charles Hinman, *Countywide Letter in Support of LGBTQIA
   Students*, Santa Clara County Office of Education (Mar. 6, 2025) ...................4, 13

Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* ...............................5, 6, 14

Sunnyvale Sch. Dist., *LGBTQIA+ Resources* ...........................................................5, 6

Sunnyvale Sch. Dist., *Resolution # R22-08: Enhancing Supports and
   Resources for Our LGBTQIA Students and Staff* (Oct. 7, 2021) .......................3, 4

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    iv

Sunnyvale Sch. Dist., *Resolution # R26-08: Reaffirming
Sunnyvale's Commitment to Safe, Inclusive Schools for
All Students and Staff* (Sep. 18, 2025) ...................................................... 4, 5, 14, 24

Sunnyvale Sch. Dist., *SSD Board of Education passes resolution
reaffirming the District's commitment to safe, inclusive schools* ............................5

Sunnyvale Sch. Dist., *What Are My Rights at School?
Transgender + Nonbinary Students* ...................................................................... 3-4

Sunnyvale Sch. Dist., *4th - 8th Grade Growth Development
& Sexual Health Scope & Sequence* ............................................................................9

Sunnyvale Sch. Dist., *Parent Resources for Growth,
Development and Sexual Health – Grades 4-8* ..........................................................9

**Constitutional Provisions**

U.S. Const. art. VI ............................................................................................................21

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY
INJUNCTION
CASE NO.: 5:26-cv-06211                    v

## MEMORANDUM OF POINTS AND AUTHORITIES

In recent years, some public school districts have incorporated books and lessons promoting LGBTQ+ messages in kindergarten and elementary instruction. Last year, the Supreme Court held in *Mahmoud v. Taylor* that public schools burden parents' First Amendment rights when they require children to participate in "LGBTQ+-inclusive" instruction that conflicts with their parents' religious beliefs. The decision to "withhold notice to parents" and to "forbid opt outs" from such instruction imposes an "unacceptable" "burden on religious exercise" and immediately triggers strict scrutiny.

Defendants Sunnyvale School District (the "District"), its Superintendent and Board members, and the named District employees (collectively, "Sunnyvale") resisted. Shortly after *Mahmoud* was handed down, the District resolved to "confidently implement inclusive materials and resist pressures that would erase or diminish LGBTQIA content." It pledged to provide "robust education that celebrates diverse … gender expressions." And it fulfills that pledge by supplying teachers with lesson plans and books applauding pride parades, same-sex relationships and attendant family structures, gender transitions, and drag queens.

Plaintiffs Justin and Rose Taylor are devout Christians who have a rising third-grade son and rising first-grade daughter at Cumberland Elementary School in the District. They believe that Sunnyvale's LGBTQ+ instruction is age-inappropriate and inconsistent with their religious beliefs, practices, and child-raising philosophies, and that forcing their children to participate in Sunnyvale's LGBTQ+ instruction will undermine their efforts to raise their children in accordance with their religious beliefs. So, last September, they asked Sunnyvale to notify them and opt their children out of all LGBTQ+ instruction.

At first, Sunnyvale displayed discretion and willingness to accommodate the Taylors. Sunnyvale provided the Taylors with a form acknowledging opt-outs not only for categories like sexual health education, but also for "[i]nstructional [m]aterials" that

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                 1

"substantially interfere with [a] child's religious development" or "conflict with [parents'] religious beliefs or moral convictions." And Cumberland also directed school librarians not to check out LGBTQ+ materials to the Taylor children.

But months later, Sunnyvale abruptly reversed course and denied the Taylors' request for notice and opt-outs. Sunnyvale announced in a letter that it is "not granting opt-outs from LGBTQ+-inclusive curriculum or storybooks that are part of our adopted educational program." In doing so, Sunnyvale dismissed *Mahmoud* as a decision from "another state" that "does not override" its interpretation of "California's statutory requirements governing instructional content." But Sunnyvale's rejection of *Mahmoud* is baseless, and its denial of notice and opt-outs is unconstitutional several times over.

First, *Mahmoud* straightforwardly controls here. Sunnyvale insists upon the same kind of religiously violative LGBTQ+ instruction, at the same grade levels, using the same or similar books, without the notice and opt-outs *Mahmoud* demands. Lacking daylight, Sunnyvale is left to claim that the Free Exercise Clause somehow applies differently in California. But the Supreme Court rejects this backward view: Bill of Rights guarantees have "the same meaning in all parts of the United States" regardless of "local attitudes." Sunnyvale's theory of Californian exceptionalism is unserious.

Second, Sunnyvale has independently burdened the Taylors' religious exercise by enforcing a policy that is neither neutral nor generally applicable. It is not generally applicable because Sunnyvale retains discretion to allow individualized exemptions— both through its tailored Opt-out Form, and its library accommodation for the Taylor children. Sunnyvale's policy also lacks general applicability because it permits comparable secular opt-outs for health class (including LGBTQ+ components) and a host of other educational and extracurricular programming, thus categorically treating such secular activity more favorably than the Taylors' religious exercise. And Sunnyvale's awareness that the burden of its no-opt-out policy falls overwhelmingly on religious parents means that the policy is not neutral, either.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    2

Third, under recent Supreme Court precedent, Sunnyvale's policy violates the Taylors' parallel Due Process Clause right to make key decisions regarding the education of their children. *Mirabelli v. Bonta* eliminated any doubt about the force of this right and its applicability in the Golden State, confirming that "parents who objected to [California's] policies" limiting parental rights in public schools "on due process grounds" were equally entitled to constitutional protection. So too here.

Strict scrutiny necessarily follows, and Sunnyvale cannot satisfy it. Any purported interests in uniformity, administrability, and inclusivity are undermined by Sunnyvale's extensive opt-outs from other instruction and programming, including LGBTQ+ lessons in health class. And forcing the Taylor children to undergo instruction that contradicts their parents' religious guidance is not the least restrictive means of accomplishing any compelling interest. The Taylors' motion for preliminary injunction must be granted.

## STATEMENT OF FACTS

### A. Sunnyvale's LGBTQ+ Instruction

Sunnyvale has made LGBTQ+ instruction and advocacy a mainstay of its educational agenda, including at the elementary level. In 2022—observing that "LGBTQIA people have achieved significant milestones, ensuring that future generations will enjoy a more equal and just society"—the Sunnyvale Board of Education resolved to "support[] training to deepen understanding of LGBTQIA issues and policy implementation to support LGBTQIA students, staff and community members." Sunnyvale Sch. Dist., *Resolution # R22-08: Enhancing Supports and Resources for Our LGBTQIA Students and Staff* at 1 (Oct. 7, 2021), https://perma.cc/5SBX-SNYG. Sunnyvale has demonstrated its commitment to the LGBTQ+ movement in myriad ways.

For example, Sunnyvale has adopted a policy for "[t]ransgender and [n]onbinary [s]tudents" declaring that, "[i]n Sunnyvale School District, we have Gender Support Plans, which allow YOU to decide how teachers and school staff should support your gender identity." Sunnyvale Sch. Dist., *What Are My Rights at School? Transgender +*

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                3

*Nonbinary Students*, https://perma.cc/D7FM-JSV5. The same policy explains that, in Sunnyvale, "it's up to YOU who knows your real name & pronouns," and that "includes your parent(s)/guardian(s), if they are unaware or unsupportive." *Id.* And it tells children that, in Sunnyvale, "[y]ou have the right to use any restroom and locker room that matches your gender identity," no matter the feelings or privacy of others. *Id.*

This case concerns Sunnyvale's infusion of LGBTQ+ instruction throughout elementary school. In its 2022 Resolution on the subject, the Board committed to "ensure that diversity and inclusion are better reflected across the preschool to eighth grade curriculum." *Resolution # R22-08* at 1, https://perma.cc/5SBX-SNYG. More recently, in response to perceived "federal attempts to roll-back LGBTQIA+ rights," Sunnyvale joined other Santa Clara County school districts in pledging to "stand firmly with our LGBTQIA+ community" and "support[] a robust education that celebrates diverse … gender expressions." Santa Clara Cnty. Off. of Educ., *Countywide Letter in Support of LGBTQIA Students* at 1 (Mar. 6, 2025), https://perma.cc/JTD8-5JUC (signed by the superintendent of Sunnyvale School District).

The result of Sunnyvale's commitment is a sweeping mandate integrating LGBTQ+ history, representation, and examples throughout school curricula to celebrate "diverse backgrounds, identities, experiences, and abilities, including those who are lesbian, gay, genderqueer, bisexual, transgender, queer/questioning, intersex, [and] asexual (LGBTQIA)." Sunnyvale Sch. Dist., *Resolution # R26-08: Reaffirming Sunnyvale's Commitment to Safe, Inclusive Schools for All Students and Staff* at 1 (Sep. 18, 2025), https://perma.cc/L8UG-QFHF. According to Sunnyvale, "California state law and [Sunnyvale's own] Board-adopted policy regarding instructional materials and curriculum" demand that it does so. Compl. Ex. A at 2. "Under California law," as glossed by Sunnyvale, "districts are required to provide inclusive instructional content that reflects the diversity of our community, including representation of LGBTQ+ individuals and families, as part of our core academic program." *Id.* Following the Supreme Court's

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                  4

decision in *Mahmoud*, Sunnyvale stated it "will continue to … [e]nsure that inclusive curriculum—including LGBTQIA representation"—"remains integral to the District's equity and inclusion efforts." *Resolution # R26-08* at 2, https://perma.cc/L8UG-QFHF. Sunnyvale has made clear that this mandatory instruction applies "across [all] grade levels." Sunnyvale Sch. Dist., *SSD Board of Education passes resolution reaffirming the District's commitment to safe, inclusive schools*, https://perma.cc/B33Q-YZF5.

Sunnyvale has left little doubt about the pervasiveness of its instruction. It has a dedicated webpage providing "LGBTQIA+ Resources," including lesson plans and recommended LGBTQ+ book lists for all reading levels. Sunnyvale Sch. Dist., *LGBTQIA+ Resources*, https://perma.cc/RA8E-HSHG. Some come directly from controversial LGBTQ+ advocacy organizations. *See id.* (referring teachers to lessons, booklists, and resources from Glisten (formerly GLSEN), the Human Rights Campaign's Welcoming Schools initiative, and the group Gender Spectrum). Sunnyvale also embraces County guidance on LGBTQ+ instruction. *See id.* (linking Santa Clara County Office of Education ("SCCOE") LGBTQ+ teaching guidance under "Staff Resources").

Through various book recommendations and "Example Lesson" plans across grade levels and class subjects, the SCCOE's *LGBTQ+ Teaching Guide* illustrates how Sunnyvale's commitment to LGBTQ+ instruction is meant to work in practice. According to the Guide, "Health and Science Lessons" should adopt a "strategy" of "explicitly teach[ing] about gender identity and sexual orientation in a comprehensive and inclusive way." Santa Clara Cnty. Off. of Educ., *LGBTQ+ Teaching Guide* at 21, https://perma.cc/EVJ5-Y8Y6. "History Lessons" should promote "acceptance of diverse gender identities and expressions," with the goal of "disrupt[ing] traditional definitions of the family." *Id.* at 8-10. Similarly, for math, the Guide directs that "[i]ncorporating LGBTQ+ inclusion in mathematics curriculum is crucial," so teachers should "use problems that relate to marriage equality, gender-neutral bathrooms, and LGBTQ+ rights to demonstrate mathematical concepts such as statistics, probability, and

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                 5

geometry." *Id.* at 12. And "Literacy Lessons" should include various "LGBTQ" books for "Pre K – Elementary" ages. *Id.* at 17 (collecting recommended book lists). The normative motivation is plain, as the Guide observes in quoting "LGBTQ+ rights activist" Barbara Gittings: "The struggle is really won in the hearts and minds of the community, where it really counts." *Id.* at 8.

To that end, Sunnyvale promotes dozens of recommended "LGBTQIA+ and gender-related" picture books for classroom instruction. *LGBTQIA+ Resources*, https://perma.cc/RA8E-HSHG; Compl. ¶¶ 73-74, 82. The normative throughlines in the colorful stories are unmistakable. The books encourage children to question sexuality and gender identity, focus at an early age on romantic feelings, affirm same-sex relationships, embrace gender transitioning, and celebrate LGBTQ+ lifestyles. *See id.* ¶¶ 75-81. Some examples of the books Sunnyvale recommends for LGBTQ+ instruction are illuminating:

- *The Hips on the Drag Queen Go Swish, Swish, Swish*, by a drag queen's persona Lil Miss Hot Mess, celebrates drag to the lyrics of "The Wheels on the Bus," with images of bearded drag queens "swish[ing]" their hips and "shimmy[ing]" their shoulders. *Id.* ¶ 77.

- *Pride Puppy* invites three- and four-year-olds to look for images of things they might find at a pride parade (*e.g.*, "[drag] queen," "leather," "underwear," and a famous LGBTQ activist and sex worker) and depicts a minister wearing a rainbow stole and students and teachers enthusiastically advocating for "Peers + Queers," "Pride Club," "Love Knows No Gender," and "Two Spirit Pride." *Id.* ¶ 75.

- *Prince and Knight* is a romance about a prince who falls into the "embrace" of a "handsome" knight, culminating in the whole kingdom applauding "on the two men's wedding day." *Id.* Ex. E at 6-36; *id.* ¶ 76.

- *Stella Brings the Family* tells the story of a young girl who brings her two fathers and extended family to a classroom Mother's Day party, which ends up being even "better than [she] had imagined" after she is joined by "the biggest crowd of them all." *Id.* ¶ 80.

- *Jack (not Jackie)* follows the story of a young girl, Susan, who struggles with her younger sibling Jackie's gender transition but, with her mother's guidance ("not wrong … just different"), declares "My sister. My brother. It's okay, either way," causing her "heart … to feel bubbly again." *Id.* ¶ 78.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                6

- *Born Ready: The True Story of a Boy Named Penelope* traces others' acceptance of the gender transition of a young girl, who doesn't "want tomorrow to come because tomorrow" she will look like her mom, and whose family and educators come around to the idea that "gender isn't such a big deal" and that the child's self-identification is determinative because "*[t]his is about love.*" *Id.* Ex. F at 13, 18-19; *id.* ¶ 81.

### B. The Taylors' Religious Beliefs

The Taylors are devout members of The Church of Jesus Christ of Latter-day Saints. Decl. ¶ 3. They teach their children that every individual has inherent divine worth and equal dignity before God and should be treated with love, kindness, and respect, regardless of religion, race, gender, or nationality. *Id.* ¶¶ 6-7. They also embrace the Church's teachings on gender, sexuality, and the family, which for them have eternal significance. *Id.* ¶¶ 8-9. In accordance with these teachings, the Taylors believe that sexuality is a gift from God that should be expressed only in marriage between a man and a woman. *Id.* ¶ 10. And they believe that a person's biological sex is inseparable from that person's "gender" and constitutes an essential characteristic of that person's eternal identity and purpose. *Id.* ¶¶ 8-9.

The Taylors have a religious obligation to teach these principles to their children and to protect them from conflicting influences and authorities. *Id.* ¶¶ 11-14, 16-20. They believe that young children must especially be protected from contrary influence during their "formative" years, when it is not necessary for them to explore issues surrounding human sexuality. *Id.* ¶ 14. This is protected time for parents to teach the children a faith-based perspective on these complex and sensitive issues. *Id.* ¶¶ 14-20. The Taylors believe that failure to fulfill this protective duty—which extends to any "lessons or examples" that would "confuse" or lead children astray—leaves them "accountable before God." *Id.* ¶¶ 13-14.

Even as their young children mature, the Taylors believe they should be taught about gender and sexuality in age-appropriate ways and consistent with their religious beliefs. *Id.* ¶¶ 17-18. This includes teaching their children to channel eventual romantic passions, rather than indulge them at first spark. *Id.* ¶ 19. It also requires teaching their

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    7

children to honor God's divine plan concerning marriage, sexuality, and gender, and not to condone, affirm, or celebrate perspectives or lifestyles that invert or reject that plan. *Id.* ¶¶ 19-20. Indeed, the Taylors believe that it is spiritually harmful to suggest, especially to young children, that a person's biological sex can be "wrong" or otherwise unwoven from that person's "gender," and that encouraging children prematurely to question their sexuality and gender identity is spiritually injurious. *Id.* ¶¶ 16-17, 20.

Teaching such principles and perspectives to children is inconsistent with the Taylors' religious beliefs and interferes with their chosen way of life, their aspirations for their children, and their understanding of God's will. *Id.* ¶¶ 14-15, 18-20. The Taylors also believe that letting teachers talk to children about sexuality, inviting them to question their gender identity, and encouraging them to embrace or celebrate same-sex relationships and gender transitioning is spiritually and emotionally harmful. *Id.* ¶¶ 12, 16, 19. This includes instruction about LGBTQ+ identities and language usage (*e.g.*, different-sex pronouns) that "embed ideological, sexualized, and religiously violative messages under the guise of 'inclusion.'" *Id.* ¶¶ 16. And because children—particularly those, like the Taylors' own, in elementary school—are highly impressionable, exposing them to one-sided ideological instruction from authoritative schoolteachers on such complex and sensitive issues imposes serious risks. *Id.* ¶¶ 16-17. Encouraging them to focus prematurely on such issues can similarly distort their understanding of who they are and what is most important in life—questions young children should "consider with the guidance of their parents and religious community." *Id.* ¶¶ 12, 14, 17.

The Taylors' faith forbids subjecting their young children to Sunnyvale's LGBTQ+ instruction, which undermines the very beliefs and values they are obligated to instill. *Id.* ¶¶ 13, 18, 20. They do not ask to change the curriculum itself. *Id.* ¶ 23. They seek only a modest accommodation: the right to be notified and to opt their children out from instruction that violates their religious beliefs. *Id.* ¶¶ 24-26.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                8

**C. Sunnyvale's Provision and Denial of Opt-Outs**

Sunnyvale, like public school districts nationwide, liberally accommodates students' unique needs every day. Under California law, Sunnyvale must provide notice and opt-outs for health classes because "parents and guardians have the ultimate responsibility for imparting values regarding human sexuality to their children." Cal. Educ. Code § 51937; *see also id.* §§ 51938-39 (notice, opt-outs, and alternative activities). In elementary school, health education includes instruction on "Gender Identity and Sexual Orientation," with objectives such as: to explore "[d]ifferent types of gender identities"; to define "attraction & the most common sexual orientations"; and to consider the relationship between "[b]ody parts and gender identity."[1] When such instruction is provided during health class, state law requires facilitating parental opt-outs.

Sunnyvale's accommodations go further still. More than one-in-seven Cumberland students are removed from class for special programming like Individualized Education Programs, and an even greater share receives similar accommodations as emergent multilingual learners ("EMLs"). Compl. ¶ 85 & n.8.

At least as of October 2025, Sunnyvale provided parents a form listing various "opt out options." *Id.* ¶ 92. In addition to opt-outs from health class (comprehensive or partial), the form included parental opt-out rights for behavioral health surveys, physical examinations, and "[o]ther [i]nstructional [m]aterials" that "substantially interfere with [a] child's religious development" or "conflict with [parents'] religious beliefs or moral convictions." *Id.* ¶ 93. The form indicated that Sunnyvale would "review" requests and "excuse [the parents'] child from that instruction in accordance with applicable law." *Id.*

Based on their religious beliefs and attention to their children's faithful upbringing, in September 2025, the Taylors reached out to their children's teachers and

---

[1]   Sunnyvale Sch. Dist., *4th - 8th Grade Growth Development & Sexual Health Scope & Sequence*, https://perma.cc/7BHS-NUSV; *see also* Sunnyvale Sch. Dist., *Parent Resources for Growth, Development and Sexual Health – Grades 4-8*, https://perma.cc/Z5UV-TZU8.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    9

Cumberland's Interim Principal Shana Riehl to request such an accommodation. *Id.* ¶ 87. Specifically invoking *Mahmoud*, they asked that the school (1) provide them with "[a]dvance written notice whenever any 'LGBTQ+-inclusive' storybooks or similar materials, will be used in any way"; (2) allow their children to be "excused from those lessons, instructions, and events" and be afforded "a neutral alternative activity"; and (3) provide "[i]nformation about how the District permits parents to review curriculum materials." *Id.* ¶ 89. The Taylors also engaged the District's Director of Student Support Services, Paul Slayton. *Id.* ¶¶ 92, 94; *id.* Ex. B at 2-7.

Initially, there was hope. Cumberland made a notation to school librarians not to check out books that carried LGBTQ+ messages to the Taylor children and tried to facilitate review of curricular materials. *Id.* ¶ 91; *id.* Ex. B at 2-7. Mr. Slayton provided a completed religious Opt-out Form in October 2025. *Id.* ¶¶ 92-93*; id.* Ex. B. And on January 28, 2026, Mr. Slayton explained that Sunnyvale's "typical 'opt out' process [was] not functional for Mahmoud v. Taylor yet" and that "legal council [sic] [was] still a bit confused as to how to formally respond to these requests." *Id.* ¶ 97. He thus stated he would "defer" the Taylors' request until he could consult District leadership. *Id.*

Days later, on February 3, 2026, Sunnyvale issued a wholesale denial. *Id.* ¶ 102. Acknowledging the "shift" in approach, Mr. Slayton provided an official denial letter from the Superintendent and Board based on "a comprehensive review" of the Taylors' request "at the District leadership level." *Id.* ¶¶ 102-03. The denial letter expressed Sunnyvale's position that LGBTQ+ instruction is mandatory under "California state law and Board-adopted policy," and stated: "Sunnyvale School District is not granting opt-outs from LGBTQ+-inclusive curriculum or storybooks that are part of our adopted educational program." *Id.* ¶ 104; *id.* Ex. A at 1. And, observing that *Mahmoud* involved "another state," the letter asserted that the ruling "does not override California's statutory requirements governing instructional content," as interpreted by Sunnyvale. *Id.* Ex. A

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    10

at 1. Sunnyvale did not substantively respond to the Taylors' subsequent reconsideration request and continues to deny them their requested notice and opt-outs. *Id.* ¶¶ 111-14.

## LEGAL STANDARD

A preliminary injunction is appropriate where the plaintiff has established (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). That standard is easily met here. *E.g.*, *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (finding all factors met on similar facts).

## ARGUMENT

**I. The Taylors are likely to succeed on the merits of their claims.**

**A. Prohibiting parental opt-outs triggers strict scrutiny under the Free Exercise Clause.**

Although "people of goodwill in our country can have different perspectives" on "sensitive matters that involve children, parents, sexuality, and religion," binding precedent clearly establishes "some common ground under law." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025). In particular, *Mahmoud v. Taylor* establishes that parents have the right to receive notice and to opt their children out of LGBTQ+ instruction that violates their sincerely held religious beliefs and substantially interferes with the religious upbringing of their children. 606 U.S. at 550. And more broadly, *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education* establishes that even when parental rights are not implicated, a government policy that violates one of the "three bedrock requirements of the Free Exercise Clause" is not neutral and generally applicable. 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*"). Because Sunnyvale's no-opt-out policy burdens the Taylors' religious exercise under both strands of free-exercise jurisprudence, it is subject to strict scrutiny. *See Mahmoud*, 606 U.S. at 564; *FCA*, 82 F.4th at 685-86. And because Sunnyvale cannot satisfy strict scrutiny, its policy violates the Free Exercise Clause.

**1. Sunnyvale's no-opt-out policy violates the Free Exercise Clause under *Mahmoud* by interfering with the Taylors' right to direct their children's religious upbringing and education.**

Straightforward application of *Mahmoud* resolves this case. Public schools burden parents' free exercise when they "require[] them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill in their children." *Mahmoud*, 606 U.S. at 530 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). This includes mandatory "LGBTQ+-inclusive" instruction that, even if "subtly," "present[s] certain values and beliefs as things to be celebrated"—such as "same-sex marriage" or that people "can choose [which gender] to identify with"—when religious parents "wish to present a different moral message to their children." *Id.* at 550-52. When such a burden exists, strict scrutiny applies "regardless of whether the [policy] is neutral or generally applicable," and failing it means schools must provide notice and honor religious opt-out requests. *Id.* at 565, 568.

*Mahmoud*'s factual parallels are striking. There, the Montgomery County, Maryland, school board incorporated "LGBTQ+-inclusive" storybooks and lessons in its K-12 curriculum. *Id.* at 533. The plaintiff parents, like "[m]any Americans," faithfully believed that "same-sex marriage should not be condoned," "that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly." *Id.* at 550, 552. Yet Montgomery County's LGBTQ+ instruction "present[ed] the opposite viewpoint to young, impressionable [elementary-aged] children who are likely to accept without question any moral messages conveyed by their teachers' instruction." *Id.* at 550-51. Among the books approved for instruction were *Pride Puppy*, *Prince & Knight*, and *Born Ready*, along with others that—sometimes "subtly" or "slyly" and sometimes in a "less veiled manner"—reflected messages that "same-sex marriage should be accepted" and that it is incorrect and even "hurtful" to "hold the view that gender is inextricably bound with biological sex." *Id.* at 551-53. Religious parents petitioned the school board to provide notice of the

LGBTQ+ instruction and allow opt-outs. *Id.* at 540-43. Despite already providing notice and opt-outs for gender and sexuality instruction in health classes, Montgomery County refused to notify parents and allow them to opt their children out. *Id.* at 538-49, 568. In all this, so too here.

And *Mahmoud*'s legal analysis is dispositive. The Court held that the school board's "introduction of the 'LGBTQ+-inclusive' storybooks [and classroom instruction]— combined with its decision to withhold notice to parents and to forbid opt outs— substantially interfere[d] with the religious development of [the plaintiff parents'] children and impose[d]" an "unacceptable" "burden on religious exercise." *Id.* at 550. This was so because the books approved by the board for instruction, "[l]ike many books targeted at young children," were "unmistakably normative" and conveyed "values," "viewpoint[s]," "perspective[s]," and "moral messages" around same-sex marriage and "hotly contested view[s] of sex and gender" that conflicted with the "religious principles" and "beliefs that the parents wish to instill in their children." *Id.* at 550-53. That the instruction was geared toward "very young" children put this burden into sharper relief. *Id.* at 551. Children "emulat[e]" and "implicitly trus[t]" their "teachers as role models" and are "susceptibl[e] to peer pressure." *Id.* at 554-55. So the "objective danger" of classroom LGBTQ+ instruction that "contradict[s] their parents' religious views" "is only exacerbated [where] the books will be presented to young children by authority figures in elementary school classrooms." *Id.*

Sunnyvale's mandatory LGBTQ+ instruction without parental notice and opt-outs substantially interferes with the Taylors' right to direct the religious development of their elementary-aged children for all the same reasons. Sunnyvale "require[s]" LGBTQ+ instruction "as part of [its] core academic program." Compl. Ex. A at 1. It has committed to "supporting a robust education that celebrates diverse … gender expressions." *Countywide Letter in Support of LGBTQIA Students* at 1, https://perma.cc/JTD8-5JUC. And it has resolved, in *Mahmoud*'s wake, to "[p]rovide strong guidance, resources, and

training for teachers to confidently implement inclusive materials and resist pressures that would erase or diminish LGBTQIA content." *Resolution # R26-08* at 2, https://perma.cc/L8UG-QFHF.

The teaching guidance, lesson plans, and books recommended by Sunnyvale all march to the same beat: encouraging students to question "society's norms" around sexual orientation and gender identity; promoting "acceptance of diverse gender identities and expressions"; "disrupt[ing] traditional definitions of the family"; and advocating "marriage equality." *LGBTQ+ Teaching Guide* at 7-9, 12, https://perma.cc/EVJ5-Y8Y6. These are the same normative messages as the instruction in *Mahmoud*—sometimes via the same books. Messages such as: That all should accept the moral equivalence of same-sex marriage and, indeed, "celebrat[e]" it (*Prince & Knight*). *Mahmoud*, 606 U.S. at 551; Compl. ¶ 76. That pride parades are jubilant, family-friendly events enjoyed by clergy, teachers, and children alike (*Pride Puppy*). *Mahmoud*, 606 U.S. at 533 n.3 (observing that school board "removed [*Pride Puppy*] from the curriculum due to content concerns"); Compl. ¶ 75. That drag queens are objects of celebration and emulation (*The Hips on the Drag Queen*). Compl. ¶ 77. That youth gender transitions are no big deal and should be affirmed (*Jack (not Jackie)*; *Born Ready*). *Mahmoud*, 606 U.S. at 553; Compl. ¶¶ 78-79. And that "any arrangement of people—of whatever sex—can be a family so long as they 'love each other.'" (*Stella Brings the Family*). *Alan L. v. Lexington Pub. Schs.*, 814 F. Supp. 3d 61, 74, 77 (D. Mass. 2025) (citing *Mahmoud* and granting preliminary injunction requiring notice and opt-outs for LGBTQ+ instruction including *Stella Brings the Family* and *Prince & Knight*). All this "unmistakably convey[s] a particular viewpoint about same-sex marriage and gender." *Mahmoud*, 606 U.S. at 555-56. And such decisions may well be Sunnyvale's prerogative. But Sunnyvale has gone further, declaring that it "is not granting opt-outs from LGBTQ+-inclusive curriculum or storybooks that are part of [its] adopted educational program." Compl. Ex. A at 1. So there is no escaping Sunnyvale's LGBTQ+ messages.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                14

But the Taylors "wish to present a different moral message to their children," and their ability to do so "is undermined when the exact opposite message is positively reinforced in the public school classroom at a very young age" without notice or opt-outs. *Mahmoud*, 606 U.S. at 552; *see supra* at 7-9 (explaining the Taylors' religious beliefs regarding marriage, family, sexuality, gender, and child-rearing). That is a classic burden on "parents' right to the free exercise of religion," and its "special character" requires immediate strict scrutiny. *Id.* at 563-65.

### 2. Sunnyvale's no-opt-out policy violates the Free Exercise Clause under *Fulton* by allowing individualized exemptions.

In addition to blatantly disregarding *Mahmoud*, Sunnyvale has also infringed the Taylors' religious exercise by enforcing a policy that is neither neutral nor generally applicable.

To start, Sunnyvale's no-opt-out policy is not generally applicable. "General applicability requires, among other things, that [government policies] be enforced evenhandedly." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). And when the government "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," its enforcement is not evenhanded, and its policy therefore "lacks general applicability." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). That's true whether the government's discrimination is categorical or individualized. *See FCA*, 82 F.4th at 686-90.

Sunnyvale's discretion to allow individualized exemptions is obvious from both its inconsistent treatment of the Taylors and the content of its own Opt-out Form. When the Taylors contacted Sunnyvale about receiving notice and excusing their children from LGBTQ+ instruction, Sunnyvale "sent the Taylors Sunnyvale's Parent Opt-out Form," which "identified various 'opt out options' available to parents." Compl. ¶¶ 92-93. Separately, Cumberland granted their request in part—"exercis[ing] discretion in facilitating the Taylors' request that their children not be permitted to check out LGBTQ+ books from the library." *Id.* ¶ 138; *accord id.* ¶¶ 88-91 (citing *id.* Ex. B). Yet,

after waffling on whether to grant the rest of the Taylors' request, Sunnyvale ultimately denied them notice and opt-outs from LGBTQ+ instruction in the classroom. *See id.* ¶¶ 94-106.

This inconsistent application of the no-opt-out policy—including Sunnyvale's discretionary grant of the Taylors' library request and denial of their broader curricular request—is the opposite of the "evenhanded[]" enforcement the Free Exercise Clause requires. *Waln*, 54 F.4th at 1159. It's also *more* than what's needed to trigger strict scrutiny, for, when it comes to "individualized exemptions," it's not necessary to show an exemption has been granted: "the mere existence of government discretion is enough to render a policy not generally applicable." *FCA*, 82 F.4th at 687-88 (quoting *Fulton*, 593 U.S. at 533).

Sunnyvale's Opt-out Form demonstrates such a system of government discretion. In addition to listing defined categories of instruction from which parents could opt out, *see infra* Section I.A.3, the Form offers opt-outs for any "Other Instructional Materials" that "substantially interfere wih [a] child's religious development" or "conflict with [parents'] religious beliefs or moral convictions." Compl. ¶ 93 (quoting *id.* Ex. C). With respect to these "other" opt-outs, Sunnyvale states that it "welcomes parent involvement and believes in working together to support [their] child's education." *Id.* Ex. C. As Mr. Slayton's communications with the Taylors indicated, "working together" included "explor[ing] potential accommodations" and "focus[ing] on designing an individual implementation plan" for parents to "excuse [their] child" from instruction inconsistent with their "religious beliefs or moral convictions." *Id.* ¶ 140; *id.* Ex. C. No matter whether Sunnyvale had ever granted an opt-out (it has, *id.* ¶ 138), "the mere existence of a discretionary mechanism" for exploring and designing individual exemptions precludes a finding of general applicability. *FCA*, 82 F.4th at 687-88.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    16

### 3. Sunnyvale's no-opt-out policy violates the Free Exercise Clause under *Tandon* because it includes categorical exclusions.

Even if Sunnyvale didn't allow for individualized assessments, its no-opt-out policy would still not be generally applicable. That's because Sunnyvale's policy categorically treats "comparable secular activity more favorably than [the Taylors'] religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

Sunnyvale's favoritism is reflected through both the legally required and District-selected categorical exemptions to its no-opt-out policy. For example, although Sunnyvale refuses to follow the CDE's instruction to provide opt-outs under *Mahmoud*, *see* Compl. ¶¶ 3-9, 107, Sunnyvale does comply with California law requiring it to "permit[] parents to excuse their children from 'all or part of comprehensive sexual health education [and] HIV prevention education,'" *id.* ¶ 142 (quoting Cal. Educ. Code § 51938(a))); *see also id.* ¶ 83. Thus, as in *Mahmoud*, Sunnyvale "continues to permit children to opt out of other school activities, including the 'family life and human sexuality' unit of instruction, for which opt outs are required under [state] law" regardless of reason—while refusing to excuse children from LGBTQ+ instruction based on their parents' sincere religious beliefs. 606 U.S. at 540.

Sunnyvale's categorical exemptions also extend beyond health class. Like the school board in *Mahmoud*, Sunnyvale "goes to great lengths to provide independent, parallel programming for many other students, such as those who qualify as emergent multilingual learners (EMLs) or who qualify for an individualized educational program." 606 U.S. at 566 (collecting sources); *accord* Compl. ¶ 85. Sunnyvale's Opt-out Form includes categorical opt-outs for "Physical Examination[s]" and behavioral-health "[s]urveys, tests, research, and evaluation." Compl. ¶ 144; *id.* Ex. C. And Sunnyvale also permits opt-outs from instruction for other reasons, including student participation in extra-curricular activities. *Id.* ¶ 145. In other words, while Sunnyvale's no-opt-out policy categorically disregards parents' religious objections to their children engaging with

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    17

LGBTQ+ instruction, it categorically honors parents' comparable secular objections to their children's engagement with other instruction.

To the extent Sunnyvale believes its prescribed categorical opt-outs are meaningfully different from the opt-out the Taylors requested, it is wrong. The comparability of "two activities" is "judged against" the "government interest that justifies the regulation at issue." *Waln*, 54 F.4th at 1159 (quoting *Tandon*, 593 U.S. at 62). And Sunnyvale has no valid—much less compelling—interest in allowing other parents to opt their children out of certain instruction while prohibiting the Taylors from doing the same. *See infra* Section II.A.

### 4. Sunnyvale's no-opt-out policy violates the Free Exercise Clause under *Lukumi* and *Masterpiece* because it targets religious exercise.

In addition to lacking general applicability, Sunnyvale's no-opt-out policy is also subject to strict scrutiny because it is not neutral. Instead, it unconstitutionally targets faithful parents' religious exercise.

"A government policy will not qualify as neutral if it is specifically directed at religious practice"—detectable if the policy "discriminates on its face, or if a religious exercise is otherwise its object." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (cleaned up). And if the record shows even "subtle departures from neutrality" or creates even "slight suspicion[s]" of religious intolerance, the policy violates the Free Exercise Clause. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Thus, showing overt religious hostility is not necessary. Because a government policy's "effect … is strong evidence of its object," a policy's outsized impact on religious exercise can also demonstrate non-neutrality. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). As recent precedent confirms, a policy standing "obviously in opposition to more traditional understandings of sexuality and gender" is a prime example of targeting in action. *Bates*, 146 F.4th at 794.

After *Mahmoud*, there's no question that Sunnyvale knows that the "burden" of its no-opt-out policy, "in practical terms, falls on [religious] adherents." *Lukumi*, 508 U.S.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

CASE NO.: 5:26-cv-06211                    18

at 536-37; *see Bates*, 146 F.4th at 794-95 (applying *Mahmoud*, *Masterpiece*, and *Obergefell* to find an Oregon regulation not neutral where the "overarching import and effect of Oregon's policy [fell] on prospective foster parents whose sincerely held religious beliefs contradict the state's perspective on gender identity"). For many religious parents, including "Christians, Jews, Muslims, and others, the religious education of children is not merely a preferred practice but rather a religious obligation." *Mahmoud*, 606 U.S. at 547. And like Montgomery County, Sunnyvale must be "doubtless aware" of the "substantial religious communities whose members hold traditional views on marriage, sex, and gender." *Id.* at 567. "[A]lthough one can imagine non-religious objections" to teachings on gender and sexuality, it's these religious communities whose beliefs and exercise are disproportionately impacted by Sunnyvale's targeted denial of opt-outs to its LGBTQ+ instruction. *Bates*, 146 F.4th at 794.

Even assuming Sunnyvale "intended to act in the best interests of children, and not out of hostility or animus toward religion," that would "not make [Sunnyvale's] policy neutral toward religion." *Id.* at 795; *see also id.* at 783 ("[A] state's general conception of the child's best interest does not create a force field against the valid operation of other constitutional rights."). Instead, because Sunnyvale's categorical denial of opt-outs to LGBTQ+ instruction "implicate[s] uniquely religious matters that prove most problematic for parents who view these issues through a traditional religious lens," its no-opt-out policy is non-neutral. *Id.* at 795.

## B. Prohibiting parental opt-outs also triggers strict scrutiny under the Due Process Clause.

After the Supreme Court confirmed that the Free Exercise Clause prohibits the government from stripping away religious parents' "critical right … to guide the religious development of children," *Mahmoud*, 606 U.S. at 559, the Court held that the Due Process Clause provides overlapping protection. Because *all* "parents—not the State—have primary authority with respect to 'the upbringing and education of children,'" the

Taylors' parental rights receive additional constitutional protection. *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925)).

*Mirabelli* rejected a Ninth Circuit panel's view of *Mahmoud* as "a narrow decision" that did not reach California policies requiring public schools to facilitate and conceal from parents their children's gender transitioning at school. *Mirabelli*, 607 U.S. at 495-97. Instead, the Supreme Court relied on "long-established precedent" to hold that the "parents who object[ed] to [California's] policies on due process grounds" were equally entitled to constitutional protection. *Id.* at 497; *see also City of Huntington Beach v. Newsom*, No. 25-3826, 2026 WL 1785110, at *3-4 (9th Cir. June 18, 2026) (applying *Mirabelli* and concluding parents were likely to succeed on due-process challenge to California law limiting parental rights in school setting).

By denying the Taylors notice and opportunity to opt their children out of LGBTQ+ instruction, Sunnyvale has likewise violated the Taylors' fundamental right to make key decisions regarding the "upbringing and education of [their] children." *Pierce*, 268 U.S. at 534-35. This, too, triggers strict scrutiny. *See Mirabelli*, 607 U.S. at 496-97.

**II. The no-opt-out policy cannot survive strict scrutiny.**

Denying the Taylors notice and opt-outs is neither "justified by a compelling state interest" nor "narrowly tailored in pursuit of that interest." *Mahmoud*, 606 U.S. at 564. Sunnyvale thus cannot satisfy strict scrutiny.

**A. Sunnyvale lacks a compelling government interest in denying notice and opt-outs for LGBTQ+ instruction.**

Whereas Sunnyvale "has a strong interest" in avoiding "conduct that infringes individual liberties, such as the free practice of one's religion," *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), it has no compelling interest in forcing children to participate in lessons designed to advance views about LGBTQ+ issues that contradict their parents' teachings. Neither Sunnyvale's express reason for its formal denial, nor its other insinuated justifications, support its denial of the Taylors' opt-out request.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                20

First, in response to the Taylors' request, Sunnyvale blamed its denial exclusively on its interpretation of California law. Compl. Ex. A (LGBTQ+ instruction "required," "not optional," and "not subject to parent opt-out provisions"). Neither the California Department of Education nor other districts, like Riverside, have taken this absolutist position post-*Mahmoud*. *See id.* ¶¶ 3-5, 107. Nevertheless, Sunnyvale dismissed the Supreme Court's opinion as one that "addressed a specific set of facts in another state" and "does not override California's statutory requirements governing instructional content." *Id.* Ex. A.

But this justification is not legally accurate, much less compelling. It starts off badly by inverting the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2. And its judicial acceptance would reduce the Bill of Rights to a geographic patchwork. But the First Amendment "has the same meaning in all parts of the United States"—"[m]erely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *11 (U.S. June 25, 2026). While "[d]efining the scope of liability" and obligations of public schools "under state law is the State's prerogative," "a State has no power to confer immunity from *federal* causes of action," and judges "are bound to follow federal law." *Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (summarily reversing Louisiana's elevation of state over federal law). Sometimes that means telling California governments "no." *See Mirabelli*, 607 U.S. at 495-97, 800, 802 (applying *Mahmoud* over California's "claim[] that state law … required it to adopt [its] policies"); *City of Huntington Beach*, 2026 WL 1785110 (applying *Mirabelli* to another California law). Sunnyvale has no more "power … to strip away the critical right of parents to guide the religious development of their children" than does Montgomery County. *Mahmoud*, 606 U.S. at 559.

Second, adding to Sunnyvale's formal justification, Mr. Slayton suggested that Sunnyvale's interest was also rooted in its dedication to the District's "core instructional

framework," "commitment to a unified curriculum," and "goal [of] providing a supportive and inclusive learning environment for all students while maintaining the integrity of the board-approved curriculum." Compl. Ex. G. But given Sunnyvale's mechanisms for individualized and categorical exceptions, these interests are no more compelling than Montgomery County's. *See Mahmoud*, 606 U.S. at 565-67 (holding asserted "compelling interest in 'maintaining a school environment that is safe and conducive to learning for all students'" was fatally "undermine[d]" by the county's "robust 'system of exceptions'").

And even without those mechanisms, Sunnyvale still must show a compelling interest in denying the Taylors' "*specific* exemption[]"—not just an interest in denying opt-outs generally. *Fulton*, 593 U.S. at 541 (emphasis added). But only "interests of the highest order" that are "not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S at 215. And "the historical pedigree" necessary to demonstrate any such interest is sorely lacking because Sunnyvale cannot "identify any tradition of teaching sexuality and gender identity to young children—much less a tradition of preventing parents from opting their children out of such instruction." *Mahmoud*, 606 U.S. at 581, 583 (Thomas, J., concurring). Instead, Sunnyvale's approach is "novel" and "controversial," not deeply rooted and reflective of highest-order interests. *Id.* at 583-83; *accord Ramirez v. Collier*, 595 U.S. 411, 428 (2022) (rejecting religiously burdensome practice that broke with "long history"); *id.* at 442-43 (Kavanaugh, J., concurring) ("Often, the Court also examines history and contemporary state practice to inform" "compelling" interests and "least restrictive" means.).

By contrast, the Taylors' interest in directing the religious upbringing of their children is part of an "enduring American tradition." *Yoder*, 406 U.S. at 226-27, 232. This is reflected in the near-ubiquitous human sexuality opt-outs that school districts grant

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    22

nationwide. *See, e.g.*, Cal. Educ. Code § 51938.[2] Given that our country has long recognized that parents hold the "primary function and freedom" to prepare their children for the obligations the state cannot administer, *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000), Sunnyvale is not entitled to dismiss the Taylors' rights "out of hand," *Mahmoud*, 606 U.S. at 557. Instead, Sunnyvale must respect the widespread, "longstanding practice" of protecting parental rights for what it embodies, *Ramirez*, 595 U.S. at 435: "a principle of general applicability" that provides "robust protection for religious liberty." *Mahmoud*, 606 U.S. at 558. Because Sunnyvale refuses, it fails at step one.

### B. The no-opt-out policy is not the least restrictive means for achieving the asserted government interest.

Even if Sunnyvale could identify a compelling interest, denying the Taylors' request for notice and opt-outs is not the least restrictive means of achieving that interest.

Here too, Sunnyvale's conduct reveals that its total denial of religious-based opt-outs from LGBTQ+ instruction is overkill. Its maintenance of categorical opt-outs and discretionary accommodations for a variety of other educational programs "undermines [any] contention that the provision of opt outs to religious parents would be infeasible or unworkable." *Id.* at 567. Simply put, if Sunnyvale can "structure the [health] curriculum to more easily accommodate opt outs, it could structure instruction concerning the 'LGBTQ+-inclusive' storybooks similarly." *Id.* Less restrictive means are readily at hand.

And to date, Sunnyvale "has failed to offer any showing that it has even considered less restrictive measures than those implemented here." *FCA*, 82 F.4th at 694. After all, although Sunnyvale believes its "first responsibility is to remind families of the richness

---

[2]    *See also* Cert. Pet. at 6-7 & nn.5-7, *Mahmoud*, 606 U.S. 522 (No. 24-297) (collecting opt-out and opt-in provisions from 47 states and the District of Columbia); *Mahmoud*, 606 U.S. at 568 (emphasizing that "[s]everal States across the country permit broad opt outs from discrete aspects of the public school curriculum without widespread consequences," and collecting examples).

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    23

of what 'opting in' [to LGBTQ+ instruction] provides," it still admits that "legal opt-out provisions [to that instruction] may exist." *Resolution # R26-08* at 1, https://perma.cc/L8UG-QFHF. Especially "[w]hen so many [other schools] offer an accommodation," Sunnyvale "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015); *see supra* n.2. It cannot do so with a straight face, and thus fails the least-restrictive-means analysis.

## III. The Taylors satisfy the remaining preliminary injunction factors.

In addition to showing a likelihood of success on the merits, a preliminary injunction is warranted when plaintiffs demonstrate that they are likely to suffer irreparable harm in the absence of a preliminary injunction, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Mahmoud*, 606 U.S. at 569. Just so here.

***Irreparable harm.*** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). Here, "[i]n the absence of an injunction, the [Taylors] will continue to be put to a choice: either risk their child's exposure to burdensome instruction, or pay substantial sums for alternative educational services." *Id.* This "choice unconstitutionally burdens the parents' religious exercise" and establishes irreparable harm. *Id.*

***Balance of equities and public interest.*** The last two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). They are uncomplicated here. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," and "rais[ing] serious First Amendment questions … alone compels a finding that the balance of hardships tips sharply in [the movants'] favor." *FCA*, 82 F.4th at 695 (internal quotation marks omitted).

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                 24

"[I]n light of the strong showing made by the parents here, and the lack of a compelling interest supporting the Board's policies, an injunction is both equitable and in the public interest." *Mahmoud*, 606 U.S. at 569. The Taylors therefore "should receive preliminary relief while this lawsuit proceeds." *Id.* Namely, Sunnyvale "should be ordered to notify them in advance whenever one of the [LGBTQ+] books in question or any other similar book [or lesson] is to be used in any way and to allow them to have their children excused from that instruction." *Id.*

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be granted in full.

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                25

Dated: July 2, 2026

                                    Respectfully Submitted,

                                    By: /s/ *Michael J. O'Brien*
                                    Eric S. Baxter (DC BN 479221)*
                                    Michael J. O'Brien (DC BN 90025077)*
                                    Amanda L. Salz (DC BN 1671976)*
                                    Phillip J. Allevato (CA BN 362581)†
                                    The Becket Fund for Religious Liberty
                                    1919 Pennsylvania Ave., Suite 400
                                    Washington, DC 20006
                                    202-955-0095 tel / 202-955-0090 fax
                                    mobrien@becketfund.org

                                    Daniel L. Chen (CA SBN 312576)
                                    Eric C. Rassbach (CA SBN 288041)
                                    The Hugh and Hazel Darling Foundation
                                    Religious Liberty Clinic
                                    Pepperdine University, Caruso School of Law
                                    24255 Pacific Coast Hwy.
                                    Malibu, CA 90263
                                    310-506-4611 tel / 310-506-7663 fax
                                    daniel.l.chen@pepperdine.edu

                                    * Admitted p*ro hac vice*
                                    † Not a member of the D.C. Bar; admitted in
                                    California. Practice limited to cases in federal
                                    court.

                                    *Attorneys for Plaintiffs*

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                 26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2026, a copy of Plaintiffs' Notice of Motion and Memorandum in Support of Motion for Preliminary Injunction, with the supporting declaration and Proposed Order, were electronically filed in this case and were emailed and mailed via First-Class Mail, postage prepaid, to Defendants' counsel below in accordance with Fed. R. Civ. P. 5(b)(1):

William B. Tunick
Jonathan A. Pearl
Suvarna Bhopale
Dannis Woliver Kelley
200 California St., Suite 400
San Francisco, CA 94111
415-543-4111 tel / 415-543-4384 fax
wtunick@dwkesq.com
jpearl@dwkesq.com
sbhopale@dwkesq.com


Dated: July 2, 2026

        /s/ *Michael J. O'Brien*
        Michael J. O'Brien

        *Attorney for Plaintiffs*

NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
CASE NO.: 5:26-cv-06211                    27